George V. CHRISTMAN et al., Plaintiff,

v.

MARISTELLA COMPANIA NAVIERA, Defendant,

v.

BOYD, WEIR & SEWELL, INC., Third-Party Defendant.

No. 65 AD. 639.

United States District Court,
S. D. New York.

Dec. 20, 1971.

848

Kirlin, Campbell & Keating by Edward L. Smith, New York City, for plaintiff.

Healy & Baillie by Nicholas J. Healy, Jr., New York City, for defendant.

Haight, Gardner, Poor & Havens by R. Glenn Bauer, New York City, for third-party defendant.

## MEMORANDUM

BRIEANT, District Judge.

Plaintiff ("Christman"), a New York partnership, engaged as a sugar dealer and broker, brought this action for breach of a charter party against defendant ("Maristella"), a Panamanian corporation, controlled by Greek shareholders and owning and operating the Greek flag, American built, Liberty ship, S.S. ERETREA. The Court has jurisdiction of this maritime contract. 28 U.S.C. § 1333.

Defendant asserts a third-party complaint against a broker for negligence and for having acted in excess of its authority in the negotiation and execution of the charter party. Third-party defendant, Boyd, Weir & Sewell, Inc. ("Boyd") is a New York corporation. This Court has jurisdiction of the third-party complaint of Maristella against Boyd not by reason of admiralty or maritime jurisdiction, but rather by reason of diversity of citizenship, under 28 U.S.C. § 1332. A prior decision to this effect has been made by MacMahon, J., Christman v. Maristella Compania Naviera, D.C., 293 F.Supp. 442, in this action, and filed November 26, 1968.

Plaintiff has made a cross-claim against Boyd for breach of expressed and implied warranties of authority as an agent to sign for defendant. Those claims are within the admiralty and maritime jurisdiction of this Court under 28 U.S.C. § 1333, as has here also been determined by MacMahon, J. in his aforesaid decision.

In August, 1963, plaintiff was the owner of 10,000 tons of bagged raw sugar located in Indonesia (Java). On September 3, 1963, it sold the sugar to Farr, et al., for delivery in Chile, pursuant to a contract (Plaintiff's Exhibit 26) requiring shipment prior to November 15, 1963. Plaintiff retained the New York firm of Victor B. Benham, acting through the witness Rohrback, for the purpose of negotiating the charter of a ship to carry the sugar from Java to Chile. Benham at all times hereinafter referred to was the broker or agent of plaintiff, and represented the cargo in search of tonnage.

On September 5, 1963, Benham telephoned to various New York firms engaged in the chartering of ships, offers in behalf of a "first-class New York sugar house", name withheld, to charter a ship for this carriage. Among those called was Boyd, a reputable ship and charter broker, long established in New York City. This corporation had been founded originally through the efforts of Howard Houlder & Partners, Ltd. of London ("Houlder"), and conducted all of Houlder's business in the New York market as cabling correspondents of Houlder. It also engaged in transactions for its own account with others than Houlder. Houlder's letterhead and published offering sheets made reference to Boyd as Houlder's "correspondents" in New York, and this relationship was generally known on the Baltic Exchange, and in the shipping industry. Houlder had for many years acted as what is known as a "London Cabling Broker" in negotiations to fix ships offered for charter on the Baltic Exchange in London for the carriage of cargo offered for transportation in New York. Houlder is one of a small number of London ship brokers, specializing in this

field. Their market function is to act as intermediaries between ship owners or ship owners' brokers, or both, on the one hand, and American charterers through their chartering brokers, on the other hand. Such cabling brokers ordinarily work with an exclusive New York correspondent. Boyd was Houlder's correspondent and had been so for forty years.

The customary procedure of Houlder and other such cabling brokers on fixing is to issue a fixture letter detailing the terms on which the vessel is fixed and ending with advice that the charter will be signed in New York and copies of the charter party issued as soon as received. As a matter of long standing custom in this regard, authority from London to fix is considered as including also the authority to sign the charter party in New York. The status and customary procedures of London cabling brokers in general and Houlder in particular as respects the foregoing procedures and insofar as concerns Boyd are well known and understood among brokers, ship owners and charterers engaged in transactions on the Baltic Exchange and the charter markets in New York.

Boyd informed Houlder by cable of the desire to effect a charter at $7.50 per long ton freight, and Houlder listed the cargo as available in an offering sheet which it distributed once or twice a day on the Baltic Exchange and elsewhere in London.

Matthews Wrightson Burbidge, Ltd. ("Matthews") is also a reputable and established ship and charter broker, active on the Baltic Exchange in London. It was, in September, 1963, acting for the vessel S.S. ERETREA in some capacities at the instance and request of the ERETREA's London managing agent, Morland Navigation Co. (London) Ltd. ("Morland"), a concern of which the witness, Captain Michael M. Maris, is director. The principal shareholder and director of defendant Maristella was a Greek national referred to as "Papanicolaou", who at all relevant times was traveling in Switzerland or elsewhere, although in general communication by telephone with Captain Maris.

The Houlder offering sheet listing the cargo (Plaintiff's Exhibit 33) came to the attention of Captain Maris at a time when the S.S. ERETREA was bound to Kaohsiung, Taiwan (Formosa), to discharge and terminate a current time charter which Captain Maris expected to complete on October 2, 1963 and which was finally completed on October 10th, due to delay in discharging cargo in Formosa. Captain Maris thought that the cargo listed by Houlder would be advantageous for the S.S. ERETREA. He viewed it as a "ballasting" cargo which would allow the ship to earn some revenue and in the course of the carriage to place herself on the west coast of South America where, hopefully, highly profitable cargoes, including, but not limited to fishmeal, could be obtained, and he believed that the ship would thereby benefit by taking such a voyage at a competitive price and limited profit.

He consulted with defendant's controlling stockholder or director in Switzerland, and then authorized Matthews to negotiate through Houlder for this charter.

Thereafter, negotiations concerning the charter proceeded on a route which may be summarized as follows: Benham's employee Mr. Rohrback, spoke by telephone or in person to Boyd's employee, Mr. Thayer, who cabled Houlder's Mr. Clark, (since deceased) who spoke with Matthews' Mr. Neville, who in turn spoke with Captain Maris, who referred the results of his discussions, in most instances, to the controlling shareholder of Maristella, hereinafter "Owner", sojourning in continental Europe.

This procedure was an open invitation to misunderstanding and the creation of variances, and the negotiations must now be reconstructed to determine the liabilities and responsibilities of the parties, in view of what took place in the course of fixing the S.S. ERETREA.

Houlder, Matthews, and Maris, are all members of the Baltic Exchange in Lon-

don. As such, they are bound by its rules, customs and traditions, and persons dealing with and through the Baltic Exchange are to be deemed familiar with its methods of work and its rules and regulations. Under the rules and customs of the Baltic, negotiation is done by brokers acting by cable or telex, by telephone, by brief handwritten notes, and by face to face conversations of which they make pencil memoranda. There is no "Statute of Frauds", and no requirement for any writing in order to make a firm contract binding on all parties. A "fixture", or firm agreement with respect to the chartering of a vessel, binding on the charterer and the owner, arises when a broker, dealing on the Baltic, says, either by a nod of the head or in words or substance, that the vessel is fixed, with reference to the most recent offer or counter-offer of the other party to the negotiation. Speed is essential, and any matter not specifically traded is to be determined with reference to the customs and usage of the particular trade, in this case, the sugar trade, and the forms of charter party used in that trade.

As a result of instructions which Captain Maris gave to Matthews and which were in turn communicated to Houlder, Houlder advised Boyd that the S.S. ERETREA was interested in the Benham cargo. On September 17, 1963, Mr. Rohrback telephoned Mr. Thayer and made a firm offer to charter the S.S. ERETREA for this Java sugar voyage and set forth terms, including the proposed freight rate of $8.00 per long ton. Terms not specified to Thayer were expressly stated to be those of the printed "Cuba-Europe 1925" form of charter used in the sugar trade. The offer was transmitted by cable to Houlder and from Houlder to Matthews and from Matthews to Morland and rejected, because the freight rate offered was unsatisfactory. Morland countered along the same channels of communication with an offer to carry for $9.50 per long ton and named certain other conditions. This counter-offer advised an unwilling-

ness to discuss detailed terms of the charter party until agreement had been reached on the freight rate.

At some later point in the negotiations, at the request of defendant, it was agreed that the THORA DAN charter, a charter agreement between strangers, executed through Boyd's office on a modified Cuba-Europe sugar form, would be the basis for the charter as to all matters not specifically traded, but "delete inapplicables". I find that the THORA DAN charter referred to is the original THORA DAN charter, which is in evidence as Plaintiff's Exhibit 4. It is claimed that during the trading Captain Maris may have had in his possession a different, incomplete and altered instrument, purporting to be the THORA DAN charter, which was marked as Defendant's Exhibit F for identification, but I find that there is no explanation in the record as to how he happened to be in possession of an incomplete or different copy. Having selected the THORA DAN as a trading basis or model, defendant and its agent were under a duty to have a complete and correct copy, rather than an altered photostat and there was no way by which plaintiff or its agent could have known that defendant's agent was negotiating with respect to an incomplete or improper copy. I find that defendants contracted with reference to the actual THORA DAN charter, plaintiff's Exhibit 4, whether or not they were in possession of an accurate or complete copy, and subject to their further proviso "delete inapplicables".

At the conclusion of approximately eight days of negotiations, a conference was held on the Baltic Exchange in London, starting at about noon on September 25, 1963 and thereafter adjourned to a nearby pub. Attending the conference were Captain Maris of Morland, Mr. Clark, since deceased, of Houlder, and Mr. Neville of Matthews. The purpose of the meeting was to clarify the terms upon which the owner would charter. At this meeting Captain Maris authorized Houlder to fix the S.S. ERETREA

on terms discussed at the meeting and to negotiate respecting modification of charterer's last offer as to freight, and to fix the vessel upon reaching agreement. Immediately following the conference in London on September 25th, Houlder sent Boyd a cable accepting the previous offer of the plaintiff as transmitted by Boyd from Benham to Houlder, subject, however, to exceptions. In that message, the expression "OTHERWISE THORA DAN . . . ALSO DELETE INAPPLICABLES THORA DAN" was used (Third-party Defendant's Exhibit 19).

Plaintiff, through Benham, to Boyd, responded to Houlder for transmission to Matthews and thence to Morland with additional terms that would make lighthouse and hospital dues payable for owner's and not charterer's account and suggesting a rate, if only one loading and discharging port were used, of $9.75 per long ton rather than $10.00 as demanded by owner.

Thereafter, Morland agreed to the change respecting lighthouse and hospital dues but insisted on the $10.00 basic rate for freight. Charterer, again following the same channels of communications which were used throughout the negotiations, finally agreed to the $10.00 rate. Mr. Clark of Houlder sent a cable received at 6:50 P.M. in New York City on September 25th, confirming these negotiations and confirming that a fixture had been made at the $10.00 freight rate.

On the following day, Mr. Thayer of Boyd met with Mr. Rohrback of Benham in New York City and went over the terms of the fixture from their respective notes, and in accordance with custom of the ship brokering industry, Rohrback prepared a charter party. At the same time, Houlder sent a letter to Matthews confirming the fixture and listing the terms of the charter party. This letter is referred to as the "fixture letter" and is dated September 26, 1963 (Defendant's Exhibit A). No copy was received by Boyd until October 3, 1963.

See Exhibit 30. The fixture letter, Exhibit A, states, in closing:

"Charterparty will be signed in the States by our New York friends on Owners' behalf and copies handed to you on receipt."

Reference to "our New York friends" means, and was known to Matthews and Maris to mean Boyd.

■ On October 1, 1963, the charter party prepared by Benham was signed by the witness Langben, President of Boyd, "for and on behalf of Maristella Compania Naviera of Piraeus by cable authority from Howard Houlder & Partners, Ltd., Boyd, Weir & Sewell, Inc., brokers". Much controversy arose on the trial of this action as to whether or not Langben, acting for Boyd, had the authority to sign the charter party in New York for the owner. On all the facts, I find that Houlder, acting through Boyd, had authority to perform all the acts and make all ancillary agreements customarily performed by it in its capacity as a broker or intermediary pursuant to usual custom and practice. As stated in Argersinger v. MacNaughton, 114 N.Y. 535, 21 N.E. 1022 "the general rule is that an agent employed to do an act is deemed authorized to do it in the manner in which the business intrusted to him is usually done". The *Argersinger* doctrine has been followed in this Circuit (Masuda v. Kawasaki Dockyard Co., 328 F.2d 662 (2d Cir. 1964)). Our common law and English law are to the same effect. Restatement of the Law of Agency, 2nd Series, § 34 and Carver, Carriage by Sea, 12th Ed., Vol. 1, § 335.

■ The brokers assert that the relationship and method of operation of Houlder with respect to Boyd was well-known on the Baltic and among those persons engaged in the chartering of ships, and I find this so, even though Captain Maris, a member of the Baltic, denies that he had actual knowledge of the relationship between Houlder and Boyd. There is no evidence that Mat-

thews lacked such knowledge. Matthews was then, and is now, one of the largest firms engaged in such activity on the Baltic. Whether or not Captain Maris knew of the relationship, seems to be of little moment since during the negotiations by cable and telephone with New York over a period of more than eight days, he obviously knew that the chain of communication was being maintained in some manner between his duly authorized broker, Matthews, and plaintiff's duly authorized broker, Benham, whose name appears in the first offering cablegram as "first-class New York sugar house via Benham". Certain of the cables which were communicated to Matthews, whose knowledge is the knowledge of defendant under accepted principles of agency law, indicate internally that the transactions are going on through Boyd. The authority of Matthews in the case cannot be questioned because Mr. Neville of Matthews received his instructions directly from Captain Maris. Matthews had previously been acting for the vessel. Neither Mr. Neville, nor anyone else from Matthews, was called as a witness, nor was his deposition read into evidence either on this particular point or any other matter in issue. There is some suggestion that Matthews considered defendant's position sham. This is particularly found in the closing lines of plaintiff's Exhibit 20(c), a telex copy of a letter from Matthews to Houlder "these notes were drawn up purely at request of owner's London agent." Failure to adduce testimony or depositions of witnesses from Matthews raises an inference that the testimony unfavorable to defendant would be corroborated by these witnesses. Dow Chemical Co. (U. K.) v. S.S. Giovannella D'Amico, 297 F. Supp. 699 (S.D.N.Y.1969).

A short answer to this problem, however, is found in the testimony of Captain Maris, continually reiterated to the effect that "I told Neville to tell Clark not to send any b----- cable across and say they have authority to sign *un-*

*less these points are incorporated.*" (p. 262).

Again on page 295 Captain Maris testified:

Q And you gave authority to Boyd, Weir & Sewell to fix the ship?

A No. I gave authority to Howard Houlder & Partners.

Q This says New York friends Boyd, Weir & Sewell. Did you say they had no authority?

A As far as I am concerned, the only authority from me was Howard Houlder & Partners. But what they did with a New York friend was their own business and their own secret commitments.

p. 296:

Q Therefore as far as you were concerned it's perfectly alright for Boyd, Weir & Sewell to fix the ship?

A No.

Q Any correspondence—

A Just a second. If you are going to mean did I give Boyd, Weir & Sewell authority to fix the ship at any time she likes, that was never given, ever. If you want to mean did Howard Houlders or could Howard Houlders have authority to fix the ship under certain terms, Yes. The terms contained in this letter plus three alterations that we told him the next day.

p. 297:

Q They (Matthews) were your brokers?

A Yes. They said we fixed the ship like this. They also asked permission to sign in New York. Matthews Wrightson had advised me previously that there were three points outstanding, so I said in my presence when he was talking to—what is his name—Clark on the 27th (September) make quite clear to him that he has no authority, no authority to be given

to New York unless these questions are cleared up and that is all I have done.

I infer and find from the entire record before me that Morland, acting through Captain Maris, actually authorized Houlder to have the charter party signed in New York by Boyd. An agent has express authority or implied authority to make variations on matters not material to the bargain, and to place any reasonable construction on the specific instructions of his principal. Restatement of the Law of Agency, 2nd Series, § 385(a).

It remains now to see whether in signing the charter party on October 1st, Boyd departed from any instructions, or intentionally or by inadvertence created a material variance between the terms of the oral and cablegram fixture and the instrument as finally signed.

On September 27, 1963, Matthews, again following the customs of the business, wrote Houlder, making three observations, separately numbered, on terms of the Houlder fixture letter which Matthews suggested constituted a variance. This letter was not received or known in New York until October 3, 1963, after the instrument had been signed. The letter does not deny that a fixture has been made nor does it state whether or not the three "observations" are considered material.

On that same day, September 27, 1963, Morland wrote that the vessel was expected ready to sail from Formosa about October 2nd and asked the charterers to confirm that the ship, having previously bunkered at Singapore, could, under then existing political conditions, be loaded in Indonesia in order to carry out the fixture.

Conditions in Indonesia at the time were restive. Previously, a local dictator, Sukarno, had succeeded in interning the Captain and crew of one or more Greek flag vessels and others, found in Indonesia, and the major maritime nations had done nothing about it. Political conditions were tumultuous, Sukarno was making inflammatory public statements and economic conditions were such that, as later developed, this was the last cargo of sugar to be exported from Java, and the area now is an importer of sugar.

Plaintiff, acting at the request of Morland, investigated and informed Boyd that there would be no problem for the S.S. ERETREA in loading in Indonesia with respect to this particular cargo, notwithstanding that she may have bunkered at Singapore. This information was telexed to London by Boyd, through the same channels by which the fixture had been negotiated, on October 1st.

On October 2, 1963, Morland sought the assistance of the Greek government representative in London, because the crew was refusing to go to Indonesia, presumably because of a fear of Sukarno and concern that the major maritime nations would not be willing to protect them from internment. Captain Maris sent this information to plaintiff. On October 3, 1963, Morland ordered bunkers for the vessel and ship's stores at Singapore. The arrangements were made through Matthews and the agreement for bunkers provided that the ship would merely load fuel and stores and would not enter the inner harbor of Singapore to receive or discharge any cargo.

Meanwhile, apparently with the assistance of the Greek government, the problem affecting the crew was resolved. The crew was instructed on October 5th that it must go, and Morland, also on October 5th, received a cable (Third-party Defendant's Exhibit 45) from the Master of the S.S. ERETREA saying that the crew would cooperate.

On October 5, 1963, the ship had therefore made all necessary arrangements to carry out the fixture. At this time, however, the issue of the three claimed variances between the fixture letter of Houlder and the fixture as agreed to from the point of view of Matthews, remained undisposed of. On September 30, 1963 Houlder sent by mail a

copy of its fixture letter and Matthews' objection to the three points, to Boyd, asking for comment. Boyd replied by cable dated October 4th that the second of the three claimed variances having to do with the deletion of the words "according to the custom of the port" had been conceded as correct, but that the subjects of the two other objections had not been touched upon in the trading.

As noted, Captain Maris, at least until October 5th, considered that the vessel had been fixed. The occurrence of minor variances between oral and cable agreements and the fixture letter are not unusual in the shipbrokering industry and the same situation exists with respect to variances between the charter party as written and signed and the actual fixture. Under such conditions, the actual fixture controls and it is usual to settle by agreement, by arbitration, or if necessary by an equitable action for reformation of the instrument, any issues which may arise as a result of this type of variance, if indeed the variance is found to be material to the bargain. Since the fixture was made orally and was binding on September 25th, the written document drawn up later was without import, except as a memorandum of the terms which had been agreed to orally with respect to the fixture.

At some point on or after October 5th, it seems inescapable that the owner of the vessel determined that he would rather not complete the charter. It was, to begin with, a transaction they had accepted as a "ballasting" charter for the purpose of getting the vessel from an inactive trading area to an area of good cargo availability and high freight rates. The difficulties with the crew over going to Indonesia, and the threat of Sukarno, although surmounted, may have left an element of fear and distrust in the mind of the owner. Freight rates had increased markedly between the time that the negotiations first commenced and the first week in October, although such increase was not so marked in the sugar trade as it was in the area of general commerce (see Defendant's Exhibit I and p. 440).

For whichever of the foregoing reasons, there came a time when the owner concluded to try to get out of this bargain if it was legally possible to do so. Captain Maris took and held an honorable position in the matter. He stated, and testified on the trial, that "on the Baltic their word is their bond". He recognized that a fixture had been made for the vessel. He apparently informed the owner that the vessel could not get out of her fixture unless legal cause for doing so could be found. The owner directed Maris to take the entire problem to a barrister in London, one Roskill. Roskill quite properly declined to discuss the matter with Captain Maris and suggested that he see his solicitor. Thereafter, Captain Maris did so and Captain Maris and the solicitor went together to the barrister. The barrister reviewed the entire transaction and as a result of this conversation a lawyer's letter was drafted, and sent by Matthews, acting at the direction of the owner, to Houlder who in turn transmitted it to Boyd. The three claimed variances originally suggested by Matthews were, in the lawyer's letter, expanded to ten, with one of the original three having been dropped. All of these points were at that stage in time, trivial makeweights, and were not asserted in sincerity but rather as a means of provoking a breach by the charterers, or creating a controversy, so as to allow the vessel to get out of the fixture. A summary of the ten points is as follows:

Item 1 in the letter relates to the omission of the word "safe" before "berths" in additional clause No. 1. The witness Rohrback, who actually drew the charter party, states that he did not intentionally omit the word "safe" but that he considered the word "safe" implied or covered by other clauses in the charter party and this is the position which plaintiff takes in this action. There is some authority that the omission of the word "safe" before "berths"

was not material because the same protection would be afforded by other clauses in the charter party and would be implied from the entire charter party. Although this decision does not turn on that question, apparently under the entire charter agreement a safe berth would be implied. Cities Service Transport Co. v. Gulf Refining Co., 79 F.2d 521 (2d Cir. 1935); Compania Naviera Maropan, S. A. v. Bowaters, S. A., (1955) 2 Q.B. 68 (1955), 2 Lloyds Rep. 397 (1954), aff'd 1955, 1 Lloyds Rep. 349. The "Evaggelos TH", 2 Lloyds Rep. 200 (1971).

██ ██ If there is indeed a variance by the omission of the word "safe" before the word "berths", and if this is a material omission and not otherwise supplied in the document, then defendant was entitled to a reformation of the charter party even if the plaintiff were unwilling to consent thereto. There is no issue of fact that the reference to "safe berth" appears in Mr. Thayer's notes and Mr. Rohrback's notes. Obviously, if this had been the only disputed item, there would have been no difficulty in amending the contract to include the missing word, either consensually or by court order. The situation was not such as to justify the defendant to cast the plaintiff in anticipatory breach of the oral fixture simply because of this claimed omission, if indeed it is an omission at all.

Although not included in the fine tooth combing of the charter party which resulted in plaintiff's Exhibit 20, Captain Maris also claimed on the trial that the oral fixture excluded the use of an anchorage as a berth. The THORA DAN charter expressly contemplated loading at anchor. Only by loading at anchor could sugar be transported from the ports of Djangkar and Panarukan. This is customary and should have been known to all parties and was comprised in the negotiations when THORA DAN was incorporated by reference. A berth is defined as:

"4. The place assigned to a vessel in port *when anchored* or lying along-side a pier, a quay, a wharf, and so on, where it can load or discharge." (emphasis added) International Maritime Dictionary by De Kerchove, 2nd Ed., 1961, at p. 58.

██ Item 2—refers to the omission of the words "local or legal" which are contained in THORA DAN before the word "holidays", but are not in the disputed S.S. ERETREA charter party. As the term holiday is a more comprehensive term which will include local or legal holidays, and as so construed should be deemed more favorable to the shipowner in the context in which it was used, this admittedly minor matter is no basis to cast plaintiff in a position of anticipatory breach.

██ Item 3—relates to the commencement of the period allowed for discharging for purposes of demurrage and dispatch. The charter party may be construed by reason of the provisions in typewritten paragraph 6 at the end of the charter, which provide that "time counts from arrival at or off the port within business hours", as meeting this objection. The variance is thus one of draftsmanship only, not material and not having any substantive effect upon the vessel's rights with respect to demurrage or its obligations respecting dispatch.

██ Item 4—relates to an entirely gratuitous provision which had been inserted in the charter party providing that the payment of demurrage or dispatch in discharging ports is for consignee's account. There is no explanation of how this material came into the charter party since it was not discussed in any of the negotiations, and is not found in THORA DAN. This is not a totally unheard of provision, and is customary and represents a type of minor matter in which an agent has at least some implied authority to use his own judgment and discretion and act in accordance therewith. Plaintiff offered to accept this point along with the other nine points in the lawyer's letter, and it is so inconsequential that it cannot be

used as a basis to cast plaintiff in anticipatory breach.

Further, there is some learning to the effect that the provision read with the Cessor clause would not discharge the charterer's liability to make these payments if the consignee did not, and if no practically effective means of enforcing a lien on the cargo could be found. Although there is no indication that defendant knew it, plaintiff had already contracted with the buyers of the sugar (Plaintiff's Exhibit 26 dated September 3rd) that demurrage and dispatch should be for the account of and benefit of the buyer of the sugar, and by inserting it in the charter party Rohrback was merely trying to be consistent with Christman's agreement of sale with Farr, and the ordinary customs of the sugar trade. With respect to the Cessor clause see Crossman v. Burrill, 179 U.S. 100, 107, 21 S.Ct. 38, 45 L.Ed. 106; The Sinoe (1971, 1 Lloyds Law Reports 514). Nothing in the record required Boyd to follow the THORA DAN charter word for word, and indeed this would have been impossible. Captain Maris had specifically agreed to the Cessor clause as amended by him, with respect to THORA DAN and had given no other instructions in this regard except to say "otherwise THORA DAN, delete inapplicables". This left some judgment with the agents. The agents were entitled to exercise this judgment, but as noted it is not clear that any substantive economic change results from this claimed variance, because of the effect of the Cessor clause as interpreted, *supra*.

■ Item 5—relates to calculation of dispatch to be done on the basis of one day being 24 hours, except Saturday which shall be considered a half day. This omission does not seem significant and was within the power of the agent under his instructions as he understood them. The proposed method of calculation would be followed under the circumstances, as a normal procedure in the absence of express provision.

■ Item 6—has to do with omission of the words "if required" contained in THORA DAN but omitted in the portion of the ERETREA charter, having to do with lay days. This is trivial and of no importance and the omission does not alter significantly the obligations of the vessel. This was conceded by Captain Maris in cross-examination (p. 341).

■ Item 7—for time counting at Lirquen, one of the ports of discharge, the fixture letter stated "time at Lirquen to count from arrival at or off port during business hours, whether in berth or not, unless steamer on demurrage". As finally signed, the charter party read "time at Lirquen commences on vessel's arrival during business hours whether in berth or not". The S.S. ERETREA charter party elsewhere provides that "if the vessel is kept waiting off any loading and/or discharging ports, time to count from arrival at or off port within business hours unless steamer already on demurrage". This incorporates by reference and defines for purposes of the charter the word "arrival" with respect to Lirquen so that this variance is merely a difference in drafting and not a matter of substance.

■ Item 8—is an objection to a provision that the charterers have the right to deduct 3¾% brokerage commissions from the freight and demurrage, payable to "Benham and others". This is a trivial variance, which again is within the implied authority of the agents and cannot be deemed to create unusual burdens on the defendant. While this provision was not specifically agreed to, it was not specifically refused either and is of no moment.

■ Item 9—is an objection to the use of "cargo to be discharged" instead of "steamer to discharge". This does not materially alter the vessel's obligations.

Item 10—has to do with a provision that "if the steamer arrives between 5:00 P.M. and 7:00 A.M., time is not to count until 7:00 A.M. or as customary at the loading port". Defendant claims this should have been deleted. This is-

sue is one of those not raised in any of the cables during negotiation, but raised by Matthews' letter of September 27th. There is no merit in those claims which were not specifically traded in the cables and of minor economic importance.

Captain Maris recognized that the claimed points of variance were not unusual, could have been an oversight and in the usual course of events would have been cleared up. Alone, or taken together, they do not lead to a conclusion of anticipatory breach, under all the circumstances.

Plaintiff, when informed by telephone of this letter, took the anticipated action, and Houlder was advised by telex that the charterers would not discuss these terms while the owners were threatening not to perform and were concealing the vessel's position.

Immediately thereafter on October 9, 1963, again acting under direct instructions of the owners, Morland wrote a letter, still following the strategy suggested to him by owners' legal advisors, in which Morland stated that the charterers had breached the fixture by failing to include in the written charter party the ten points raised by Matthews on September 27th, and that alleged variances between the written charter party and the oral fixture were so substantial as to excuse the owner from further performance.

Until October 5th, the owner believed these points were immaterial. He arranged for bunkers in Singapore. He obtained assurance that there were no political problems in Indonesia that would interfere with loading. He arranged for the crew to be instructed by the Greek government when they threatened not to go to Indonesia. He informed the charterers of the vessel's sailing date. These are not the actions of an owner who had not agreed on all material terms. As stated in Williston on Contracts, 3rd Ed., § 48, p. 157:

" * * * If the contract cannot be performed without settlement of the undetermined point, each party will be bound to agree to a reasonable determination of the unsettled point in order that the main promise may be enforced."

On October 10, 1963, plaintiff advised Boyd, directly rather than through Benham, and "without prejudice to its rights under the charter party" that it offered to *amend the charter party* to conform to all of the ten items of alleged discrepancy which had recently been raised in behalf of the owner. Captain Maris apparently did not understand the reference to "without prejudice" in this response. He interpreted it to mean that after performance, Christman could still sue or arbitrate on whether or not the amendments were required, but the Court interprets the presence of the words "without prejudice" in this October 10th communication from Christman as meaning that if Christman's offer to amend the charter were not accepted by the owner and the charter were not performed by the owner, Christman would retain all its prior rights. In making such offer to conform the charter party as to the claimed variances, Christman did not admit that the owner was entitled to any such reformation. Once amended, had defendant accepted the proposal contained in plaintiff's Exhibit 27, then the charter party would have been so amended, finally and for all purposes.

It does not appear whether Morland had received legal advice on this aspect of the matter. Morland, in behalf of the owner, rejected this suggestion and instead demanded a further payment of $10,000.00 as additional freight, and the extension of the cancellation date under the charter party. There was no basis for the $10,000.00 figure except that it was forwarded to Christman by Captain Maris acting at the express direction of the owner. Maris had suggested a smaller figure, which he thought would compensate the S.S. ERETREA for any delays or expense occasioned by the necessity of working out the issues concerning the form of the charter party, and the owner had responded to this

suggestion by picking the totally unrelated and unreasonable figure of $10,000.00.

The S.S. ERETREA finished her time charter and was redelivered to her owner in the port of Kaohsiung on Formosa on October 11, 1963. She left that port on October 16, 1963 under orders for Hong Kong. On that same date she was placed on a time charter from Hong Kong to mainland China and she picked up a cargo there for Japan. There is some reason to believe that this voyage was more profitable or more to the owner's liking than plaintiff's proposed cargo from Indonesia.

Plaintiff thereafter chartered a substitute vessel, the ANASTASIA IV, at a higher price and she made the voyage intended to be made by the ERETREA. The difference in transportation costs resulting by reason of the chartering of the ANASTASIA IV as a replacement vessel for the ERETREA amounts to $42,110.97.

■ Based on all of the foregoing, I conclude that the charter party was breached by defendant's refusal to perform it without insertion of additional terms and the payment of $10,000.00 additional freight, and that plaintiff did not at any time commit such acts as would constitute anticipatory breach of the contract so as to excuse defendant from performance. Defendant had elected to treat the charter as binding after learning of the claimed variances, and even as late as October 5, 1963, defendant was still treating the charter as binding, and making all preparations to send the vessel to Indonesia. While not giving up its right to a reformation, or its right to discuss the issues, it had waived such variances as a ground for repudiation or rescission.

■ Defendant claims that plaintiff should have paid the additional $10,000.00 to it, rather than $42,110.97 additional to ANASTASIA IV, so as to discharge its duty to mitigate damages. The duty to mitigate extends to "harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense, or humiliation". Restatement of the Law of Contracts, § 336. It is not reasonable to expect the plaintiff to avoid harm if at the time for action it appears that the attempt may cause other serious harm. He need not enter into other risky contracts, or put himself in a humiliating position, or one involving loss of honor or respect.

■■ An injured party has a duty to mitigate damages only so far as can be done by reasonable effort on his part. Under the circumstances herein, I find that plaintiff acted reasonably in not complying with defendant's demand. Havemeyer v. Cunningham, 35 Barb. 515 (1861); Peirce v. Cornell, 117 App.Div. 66, 102 N.Y.S. 102 (1907). Defendant's contention as to damages is rejected.

Plaintiff, accordingly, is entitled to recover $42,110.97 with interest and costs from defendant Maristella Compania Naviera. The cross-claim of plaintiff against the third-party defendant Boyd, Weir & Sewell, Inc. is dismissed on the merits.

The claims of the third-party plaintiff Maristella Compania Naviera against the third-party defendant Boyd, Weir & Sewell, Inc. for negligence or breach of its duties as an agent are not barred by the Statute of Limitations since such Statute will not commence to run until damages have been incurred. A valid fixture was entered into, however, between the parties and it appears that the variances or deficiencies in the charter party as finally typed, if there are any, and if the same be material, were not the proximate cause of any damage. To the extent that defendant was entitled to a reformation of the incomplete or inaccurate charter party, plaintiff had offered to agree thereto and therefore such omissions were not the proximate cause of any damage incurred by defendant. Accordingly, no claim arises against Boyd, Weir & Sewell, Inc. and the third-party complaint is dismissed as against it. Boyd, Weir & Sewell, Inc. is

entitled to commissions sued for in the amount of $2,625.00 and interest and costs.

The foregoing constitutes the findings of fact and conclusions of law of the Court in this case.

Settle judgment on notice.