**CIA. NAVIERA SOMELGA, S.A.,**

v.

**M. GOLODETZ & CO., and Indemnity Insurance Company of North America.**

**No. 4051 Admiralty.**

United States District Court
D. Maryland.
Dec. 5, 1960.

---

**2.** Now 39 U.S.C.A. § 2115.

Southgate L. Morison, Ober, Williams, Grimes & Stinson, Baltimore, Md., for libelant.

Carlyle Barton, Jr., Niles, · Barton, Yost & Dankmeyer, Baltimore, Md., for respondents.

THOMSEN, Chief Judge.

In this suit in admiralty the owner of a vessel seeks to recover from the consignee of the cargo and a surety company the amount of an arbitration award which it obtained against the charterer of the vessel for demurrage and crew's overtime. The evidence presents a confused situation created by businessmen who tried to save lawyers' fees.

The case came on for hearing on exceptions to the libel and exceptive allegations filed by respondents. Evidence was originally offered in support of and in opposition to the exceptive allegations, but the parties are now agreed that they have offered all the evidence either side wishes to offer on any point in the case except laches; so they now ask the court to decide the case on the merits, reserving only to libelant the right to take additional evidence in England and elsewhere on the issue of laches, if the court should conclude that laches would bar the suit on the present record.

### Facts

Libelant, a Panamanian corporation, owner of the S. S. San Dimitris, is controlled by Lemos & Pateras, Ltd., of London, England (Pateras). The Pateras' interests also own the S.S. Anastassios Pateras. Respondent, M. Golodetz & Co. (Golodetz), a partnership, imports manganese and other metals and ores. The other respondent (Indemnity) is a well-known casualty and surety company.

On April 8, 1954, Pateras, as agent for libelant (Owner), chartered the S.S. San Dimitris to Timblo Irmaos Limitada of Margoa, Portuguese India (Timblo), to carry a cargo of manganese ore from Mormugoa to the United States. The vessel proceeded to the loading port, loaded the cargo, and on July 7, 1954, a bill of lading was issued which contained the following notations:

"Freight payable as per Charter Party, dated 8th April, 1954 at London.

"Demurrage payable as per Master's Time-Sheet which is to be settled between Charterers and Owners at London.

*   *   *   *   *   *

"All the terms, conditions, liberties and exceptions of the Charter Party are herewith incorporated."

The charter party contained the following provisions:

"21. All liability of charterer shall cease on completion of loading and payment of advance, if any, Owner having lien on Cargo for freight, deadfreight and demurrage."

"40. It is hereby mutually agreed that all disputes arising under the provisions of this Charter-Party shall be referred to and settled by Arbitration in London, Arbitrators to be commercial men and not lawyers."

During the course of the voyage a claim was presented on behalf of Owner to charterer, Timblo, for dead freight and demurrage; the claim was disputed, and on or about August 30, 1954, Pateras, representing Owner, instructed Ocean Freighting and Brokerage Corporation (Ocean), their New York representative, to exercise Owner's right to a lien on the cargo for dead freight and demurrage. Turner, of Ocean, called Golodetz, the consignee, and talked to Rosenblatt and Groggins of that firm.

A similar situation had arisen in July 1954, when the owner of the Anastassios Pateras had a claim against a cargo of ore consigned to Golodetz. In that case Morison, Baltimore proctor for Pateras, before filing a libel against the cargo had notified Groggins, who procured a "stipulation" in the form customarily used in this court to release cargo and sent the stipulation to Morison. A libel in rem against the cargo of the Anastassios Pateras was duly filed; since Morison had the stipulation in his possession, he did not direct the Marshal to seize the cargo, but filed the stipulation in the case.

That is a common practice in this and other districts. Golodetz, through its proctor, Barton, filed a claim to the cargo, and on August 6, 1954, filed a motion to dismiss the libel and release the security, contending that the suit had been prematurely brought. That motion was overruled, but further proceedings in the case were held in abeyance while the matter was arbitrated in London in accordance with the terms of the charter party. The case was finally settled in September 1958.

With that recent case in mind, when the San Dimitris matter arose about the first of September 1954, Ocean (Turner) and Golodetz (Rosenblatt and/or Groggins) discussed the situation and agreed that it would be to their mutual interest to handle the new matter without either side employing lawyers in Baltimore. Golodetz agreed to supply a "bond" and Ocean agreed not to file a libel but to permit the cargo of manganese ore on the San Dimitris to be discharged without delay. There is a dispute between the parties as to the condition or understanding upon which the bond was delivered and was to be held. Rosenblatt did not testify; and the testimony of neither Groggins nor Turner on this point is convincing. Groggins testified that Turner wanted the bond to secure the appearance of Timblo in the arbitration proceeding in London; that an award therein would be enforceable in Portugal, and Timblo was a reputable concern. In his testimony Turner denied that the bond was intended merely to assure Timblo's appearance in the arbitration proceeding, but offered no satisfactory statement of what the understanding was. The correspondence which followed, instead of unraveling the tangle which the conversations and the form of bond had created, snarled it further. Libelant contends that the court should find from all the evidence that the bond was delivered upon the condition that the amount of the arbitrator's award, if any, would be paid to Owner. But after considering all the testimony, exhibits and arguments, I find that there was no definite understanding

or agreement between the parties as to what the bond was intended to secure.

Aside from the testimony of Turner and Groggins referred to above, the relevant evidence is as follows:

Golodetz arranged for Indemnity to issue a "stipulation" similar to the one filed in the Anastassios Pateras case, without telling Indemnity that no suit was to be filed. The stipulation reads:

"In The United States District Court For The District of Maryland

---

Compania Nav. Somelga S.A. Panama,

Libellant,

-against-

Approximately 9,000 tons ore and 827 tons general cargo laden on board S.S. 'San Dimitris',

Respondent.

---

"Stipulation

"Be It Remembered, that on this 7th day of September, 1954 in accordance with the agreement of the parties, and pursuant to the Admiralty Rules of the Supreme Court of the United States, appears the Indemnity Insurance Company Of North America, a Pennsylvania corporation, having an office and usual place of business at No. 99 John Street, New York, New York, and submits itself to the jurisdiction of the Court and consents to bind itself and acknowledge itself to be bound in the sum of Thirteen Thousand and 00/000 ($13,000.00) Dollars with interest at the rate of 6% per annum from the date hereof, for the claimant of the cargo, M. Golodetz & Co., on the S.S. 'San Dimitris' to Compania Nav. Somelga S.A. Panama to abide by and fulfill the final order and decree of the Court and in case of an appeal from such final order and decree of said court then the final order and decree of the United States Court of Appeals for the Fourth Circuit, and in case of an appeal or certiorari from such final order and decree of the United States Court of Appeals for the Fourth Circuit, then the final order and decree of the Supreme Court of the United States in the above entitled cause, and unless it does so, it consents that summary process of execution shall issue against it and its goods, chattels, lands and tenements wheresoever found or to be found. "Bond No. 247,685".

No such case as that described in the title to the stipulation has ever been filed in this or any other court.

Golodetz executed the application for the bond, paid the premium, and sent the bond to Ocean on September 8, 1954, with a letter which read in part as follows:

"We are the consignees of the manganese ore, and have been asked by Messrs. Timblo Irmaos Limitada to arrange that a bond be executed for owners' claim amounting to $13,-000 for alleged dead freight and demurrage.

"Whereas we are not a party to the charter and have no liability for said claim, we have agreed at Timblo's request to arrange said bond and same is enclosed herewith.

"We understand you have teletyped the owners in London advising them that this bond has been executed and is being filed with your goodselves. We understand you are requesting owners' confirmation that cargo will be discharged without delay at New York and Baltimore."

The San Dimitris arrived in Baltimore on September 16; the cargo was discharged and delivered to Golodetz. On September 20, 1954, Ocean wrote Pateras:

"As instructed by you, we requested and received a Bond for $13,000, covering dead freight and demurrage claims. We are now advised by Mr. S. S. Groggins of Golodetz & Co., representing Charterers, that they will ask for a discontinuance of this Bond should any action be brought in the Courts here for execution. Mr.

Groggins further advises that as the Charter Party calls for arbitration in London, Charterers will insist that this is the only, and the proper, way for settling any claims brought by Owners.

"Apparently, this same type Bond was issued at Baltimore for the Anastassio Pateras, and we understand from Mr. Groggins that the same defense was entered by them in this case.

"For your inspection, we now enclose the 'San Dimitris' Bond and await your further instructions."

Pateras replied to Ocean on October 8, 1954:

"We duly received your letter of 20th September from which we note that Messrs. Golodetz & Co., state that they will ask for a discontinuance of the Bond for $13000 should any action be brought in the courts against them.

"It is the intention of Owners of the above vessel and also of the Owners of s. s. 'Anastassios Pateras' that their cases for deadfreight and demurrage shall go to arbitration in London and we are working to that end. Owners concern has been whether Charterers would fulfil their obligations following the findings of such arbitration, since the Charter Party provides that all liability of Charterers shall cease on completion of loading, Owner having lien on cargo for freight, deadfreight and demurrage. We would most certainly have exercised a lien on the cargo had you not secured the bond for $13000, the effect of which being to transfer the liability from Charterers to Receivers. Furthermore, although the Bills of Lading are said to incorporate the terms of the Charter Party, there appears to be conflict of opinion as to whether this would include arbitration.

"It will be seen therefore that in releasing the entire cargo it was essential that the vessel should first be secured in so far as deadfreight and demurrage are concerned.

"When the arbitration has taken place and Charterers have complied with the findings, it will be in order for the bond to be released but not before that time, of which please advise Messrs. Golodetz."

Neither Pateras nor Ocean sent a copy of that letter to Golodetz, but upon receipt of the letter Ocean wrote Golodetz on October 13, 1954, as follows:

"Owners now advise us that they will proceed with arbitration in London, and when this has been completed, the bond issued to cover owners' interests will be released."

During November, 1954, Golodetz paid to Timblo some $37,000, the entire balance then due by Golodetz to Timblo. The relations between those two parties were then good, but since that time a dispute has arisen between them and is now being arbitrated.

Before the first of January, 1955, arbitration proceedings were begun in London between "The Owners of the San Dimitris, Claimants", and "Messrs. Timblo Irmaos Ltda., Respondents". Neither Golodetz nor Indemnity was made a party to the arbitration nor was offered an opportunity to participate therein. On January 19, 1955, Ocean wrote Pateras:

"With our letter of September 20th we forwarded Bond received from Charterers as security for the amount in dispute concerning deadfreight and demurrage. M. Golodetz & Co. have today requested that this Bond be returned to them as the entire matter is now under arbitration in London."

Pateras replied on January 25, 1955:

"Please advise Messrs. Golodetz that it is our intention to retain this Bond as collateral security until the findings of the Arbitration in London have been fulfilled."

Ocean sent a copy of that letter to Golodetz on January 31, 1955.

The arbitrator's award was made on October 31, 1957. He "awarded and determined" that:

"1. The Claimants are entitled to receive nothing as deadfreight from the Respondents.

"2. The Claimants are entitled to receive from the Respondents the sum of Threethousand ninehundred and seventyseven pounds threeshillings (£3977–3–0) as demurrage.

"3. The Claimants are entitled to recover from the Respondents the sum of Twohundred and Sixtynine pounds twoshillings and twopence (£269–2–2) in respect of crew's overtime, and

"4. The Claimants are entitled to no interest on any of these amounts."

He directed: "That the Respondents shall forthwith pay the said sums to the Claimants."[1] (For "Claimants" read Owner and for "Respondents" Timblo.)

Whereupon Confusion, having made his masterpiece, retired to watch what the Law would do with it.

### Discussion

Libelant's (Owner's) theory of its case seems to be: that the cargo was subject to a lien for demurrage; that owner could have filed a libel in this court against the cargo; that Golodetz suggested that filing a libel was unnecessary and that Golodetz would furnish a bond instead; that if Owner had filed such a libel as was filed in the Anastassios Pateras case it could have obtained from this court a decree based upon the award of the arbitrator; and that having done all but file the libel it should have the same rights in the instant case against the bond and against Golodetz as claimant of the cargo that it would have had if it had filed the libel in rem.

Respondents (Golodetz and Indemnity) raise the following points by their exceptions and exceptive allegations: (1) That the claim based on the award is a common-law contract claim and not within the admiralty jurisdiction; (2) That Owner voluntarily failed to perfect its lien against the cargo—or its claim under the bond which would have been filed in court to release the cargo—by filing a libel in rem against the cargo before the cargo was discharged; there is, therefore, no res, in the admiralty sense, and no basis for liability on the bond; (3) That Golodetz is not bound by an award in an arbitration proceeding to which it was not a party, in which it was neither invited nor required to participate, and by the results of which it did not agree to be bound; (4) That the bond has been released; and (5) That this suit is barred by laches.

(1) The jurisdiction of admiralty courts over contract claims generally was discussed in a long footnote to the opinion of this Court in Flota Maritima Browning De Cuba, Sociadad Anonima v. The Ciudad De La Habana, D.Md., 181 F.Supp. 301, at page 307, note 8. See also Gilmore and Black, The Law of Admiralty, p. 20 et seq., esp. pp. 25–27, n. 94, n. 95. Arbitration awards are frequently enforced in admiralty courts, notably in cases arising under the United States Arbitration Act, 9 U.S.C.A. §§ 1–14.[2] Theofano Maritime Co., Limited v. 9,551.19 Long Tons, Etc., D.Md., 122 F.Supp. 853; Application of States

---

1. The arbitration further directed "That the Respondents do pay to Claimants twothirds of the Claimants costs of the Reference and of this Arbitration, to be taxed if not agreed, and do further pay twothirds of the fees and costs of this my Award (including the fees of the two Arbitrators) which I fix at One hundred and ninety two pounds three shillings (£192–3–0) and, if the Claimants shall first have paid the said sum of One hundred and ninety two pounds three shillings (£192–3–0) then I *direct* that the Respondents shall forthwith repay to the Claimants the sum of One Hundred and twenty eight pounds two shillings (£128–2–0) being twothirds of the fees and costs of this my Award."

2. For a discussion of the background and effect of the Arbitration Act, see Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978; Gilmore and Black, op. cit., p. 173.

Marine Corp. of Delaware, S.D.N.Y., 127 F.Supp. 943. In the instant case libelant's agent (Ocean) and Golodetz devised a plan to settle difficulties which arose out of a maritime transaction. No similar problem is discussed in any authority which has been cited or found, but it seems clear as well as desirable that libelant's claim should be passed upon by an admiralty court.

■ (2) The "bond" is in the form of the customary stipulation for value under Admiralty Rule 12, 28 U.S.C.A.[3] It obviously contemplates that it will be filed in a proceeding in rem against the cargo, and undertakes, on behalf of the claimant of the cargo, "to abide by and fulfill the final order or decree of the Court" in that proceeding in rem, which was never filed. The bond does not undertake to secure the payment by Golodetz or anyone else of any arbitration award which is not made the basis of a decree in the contemplated proceeding in rem. Since neither libelant nor its agent, Ocean, had any negotiations with Indemnity and since Indemnity made no representations or promises except those contained in the stipulation, there is no basis or theory upon which Indemnity may be held liable except upon its express contract. Admittedly the conditions upon which its promise was made were never satisfied. Therefore, respondent Indemnity is not liable to libelant in the instant case.

(3) Relying upon its theory that the bond was issued to secure payment of the award, libelant contends that it should have the same rights in the instant case against Golodetz as claimant of the cargo that it would have had if it had filed a libel in rem against the cargo. On the other hand, Golodetz denies that the bond was issued to secure the payment of the award and contends that it is not bound by the award in an arbitration proceeding to which it was not a party, in which it was neither invited nor required to participate, and by the results of which it did not agree to be bound. Any liability of Golodetz for the payment of the award or any part thereof must be based upon (a) some contract or agreement, or (b) an estoppel.

(a) Article 21 of the charter party provided: "All liability of Charterer shall cease on completion of loading and payment of advance, if any, Owner having lien on Cargo for freight, dead freight, and demurrage.[4]

■ The bill of lading refers to the charter party, and specifically incorporates all its terms and conditions. This put the consignee, Golodetz, on notice of the terms of the charter party, and made all its terms, including the arbitration clause, binding on Golodetz. Son Shipping Co. v. DeFosse & Tanghe, 2 Cir., 199 F.2d 687; Knauth, Ocean Bills of Lading, 1953, p. 239.

Owner might have required Golodetz, as claimant of the cargo, to arbitrate the question of Golodetz's possible liability to Owner for dead freight and/or demurrage and/or crew's overtime, and might have been entitled, in a proper proceeding in rem, to a decree based upon an award in such an arbitration proceeding. However, Owner entered into the arbitration agreement directly with Timblo and not with Golodetz,[5] and no proceeding in rem has ever been instituted.

■■ In the conversations and correspondence which the representatives of

3. Such a stipulation for value is a substitute for the res. The New England, S.D.N.Y., 47 F.2d 332; Gilmore and Black, op. cit. p. 651.

4. It should be noted that the award of the arbitrator made no allowance for dead freight, but made allowances for demurrage and crew's overtime. The latter item was not referred to in Article 21 of the charter party.

5. Under the evidence in this case Timblo was liable to Owner for crew's overtime, and was ultimately liable, either directly to Owner or indirectly through Golodetz as claimant of the cargo and Indemnity, its surety, for dead storage and demurrage. With respect to the latter items, it also had an obligation to exonerate or indemnify Golodetz.

Golodetz had with Turner (Ocean) they did not explicitly agree that Golodetz would pay all or any part of an award which might be made by an arbitrator against Timblo. The only understanding between the parties was that they wanted to save lawyers' fees, that Owner would not file a libel in rem against the cargo, and that Golodetz would deliver a bond. As to what the bond was intended to secure, there seems to have been a misunderstanding rather than an understanding. It is true that whatever the conversations may have been, Golodetz avoided the necessity to appear in a proceeding in rem, claim the cargo and file the bond before the cargo would be discharged. It is also true that in such a proceeding the liability on the bond might have been based on the amount of the demurrage which was awarded by the arbitrator against Timblo, although it does not appear how the decree in such a proceeding could have included the amount of the award against Timblo for crew's overtime. Sometimes a finder of fact may infer an agreement from the conduct of the parties, including a departure from the normal course of proceeding. But where, as in this case, two or more inferences are not unreasonable, the court should not speculate between them. Libelant has not met the burden resting upon it to show that there was a clear understanding between Golodetz and Ocean, Owner's agent. "A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not enough that they have actually agreed, if their expressions are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, may prevent the creation of an enforceable contract." 1 Corbin on Contracts, sec. 95, p. 288.

(b) Is Golodetz estopped to deny that it is obligated to pay the award against Timblo?

Golodetz made no promise or representation to Ocean with respect to the nature of the bond, and assumed no obligation to pay any award that might be made in London.

The evidence shows that Owner, through its agent Ocean, voluntarily entered into an agreement with Golodetz to by-pass any legal proceedings and to substitute therefor an inappropriate bond. The parties were dealing at arm's length and adopted the plan with their eyes open, to avoid lawyers' fees. Owner cannot legally or equitably maintain that it was misled by Golodetz. If Golodetz had been an agent of Owner, or had stood in any other fiduciary relationship to it, we would have a different situation. As it is, Golodetz changed its position as a result of the misunderstanding, in that it paid money out to Timblo in November, 1954, which it probably would not have paid if it had known that Owner intended to try to hold it liable for the entire award which might be made against Timblo in the arbitration proceeding.

No liability based on contract, quasi contract or estoppel can properly be placed on Golodetz in this case.[6]

(4) The decision, under (2) and (3) above, that no liability can be imposed on either Indemnity or Golodetz herein, makes it unnecessary to discuss their alternative argument that the bond has been canceled.

(5) Nor is it necessary to pass on the issue of laches. If the decree to be entered herein should be reversed on appeal, additional evidence should be taken on that issue.

### Conclusion

Counsel will prepare an appropriate decree sustaining the second and third exceptions, and dismissing the libel, with costs.

---

6. I hope that by this opinion the Law itself has not become ensnarled, and Confusion worse confounded.