INTEROCEAN SHIPPING COMPANY, Petitioner-Appellee,

v.

NATIONAL SHIPPING AND TRADING CORPORATION and Hellenic International Shipping, S. A., Respondents-Appellants.

No. 223, Docket 74–1713.

United States Court of Appeals, Second Circuit.

Argued Nov. 26, 1974.

Decided June 24, 1975.

---

David I. Gilchrist, New York City (Eli Ellis, Mark M. Jaffe and Hill, Betts & Nash, New York City, on the brief), for respondents-appellants.

James M. Estabrook, New York City (Lennard K. Rambusch, Stephen R. Remsberg and Haight, Gardner, Poor & Havens, New York City, on the brief), for petitioner-appellee.

Before CLARK, *Associate Justice,** and MOORE and TIMBERS, *Circuit Judges.*

TIMBERS, *Circuit Judge:*

On this appeal from an order entered April 15, 1974 after a four day hearing in the Southern District of New York, Sylvester J. Ryan, *District Judge,* pursuant to the remand ordered in our prior decision, *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 462 F.2d 673 (2 Cir. 1972), to determine whether there existed a valid charter party which contained a provision requiring the parties to arbitrate whether there was a breach of the charter party, the essential questions are:

(1) Whether the findings of fact of the district court that a valid charter party did exist were clearly erroneous.

(2) Whether the findings of fact of the district court that De Salvo, the charter broker, had authority to act for appellants were clearly erroneous.

(3) Whether the district court erred in ordering National Shipping and Trading Corporation, the guarantor of the charter party, to arbitrate.

For the reasons below, we affirm the district court's findings of fact with respect to questions (1) and (2) as not clearly erroneous; but, with respect to question (3), we modify its arbitration order by eliminating the direction that National proceed to arbitration. We af-

---

\* Hon. Tom C. Clark, Associate Justice, United States Supreme Court, Retired, sitting by designation.

firm the district court's arbitration order as modified.

## I. FACTS AND PRIOR PROCEEDINGS

This is the second time in three years that this petition to compel arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4 (1970), has been before us. On the instant appeal, the essential issues are (1) the correctness of the district court's findings of fact pursuant to the remand ordered in our prior decision, and (2) the scope of its direction to arbitrate.

In view of the comprehensive statement of facts set forth in the district court's opinion,[1] we shall summarize only those facts necessary to an understanding of our rulings on the issues stated above.

The dramatis personae includes:

Appellee Interocean Shipping Company (Interocean) was a Liberian corporation and a wholly-owned subsidiary of Bethlehem Steel Corporation (Bethlehem). Interocean owned the tanker, the Oswego Reliance, which is the subject of the aborted charter party here at issue.

Anthony Germano was an employee of Steamship Service, Inc., another wholly-owned subsidiary of Bethlehem, which acted as house broker for vessels owned by Bethlehem and its subsidiaries.

Appellant National Shipping and Trading Corporation (National) was a New York corporation engaged in chartering and operating tankers on behalf of various principals. The stock of National was held in trust for the benefit of Harry Theodoracopulos (H.T.), its vice-president. Thomas Spears was president of National.

Appellant Hellenic International Shipping, S.A. (Hellenic), was a Panamanian corporation which was wholly-

owned by Hellenic Shipping & Industries, Ltd., of Greece. The principal shareholder of the latter was John Theodoracopulos, the father of H.T.

Francis De Salvo was a broker employed by the ship brokerage firm of Poten & Partners, Inc., in New York City. De Salvo had known H.T. for many years and through him had negotiated several previous charters with National.

On March 17, 1971, H.T. invited De Salvo to lunch to discuss the tanker market. A specific unnamed vessel was discussed. This apparently was the Oswego Reliance. After lunch, H.T. called De Salvo and asked him to check on the vessel's availability for charter.

De Salvo then contacted Germano of Steamship Service concerning the Oswego Reliance. De Salvo relayed to H.T. the message that it was available for charter. H.T. told De Salvo "to bring a firm offer in".

De Salvo again contacted Germano who was hesitant to give a firm offer since he was not familiar with Hellenic, the proposed charterer. Germano told De Salvo that it would be necessary to determine what arrangements could be made for a guarantee from National, that he would have to check with his people, and that he would call back De Salvo.

Shortly thereafter, Germano called De Salvo as promised. He offered the Oswego Reliance "for reply 4:55 today". De Salvo wrote down Germano's terms and relayed them to H.T. by telephone. There followed several offers and counter-offers by H.T. and Germano, all relayed through De Salvo. At 4:45 P.M. that day, in response to one of Germano's counter-offers relayed to H.T. through De Salvo, H.T. said to De Salvo in substance, "You are confirmed".

Throughout these and the subsequent negotiations, De Salvo kept notes which were received in evidence. De Salvo's

---

1. The district court's opinion dated February 28, 1974 is not officially reported.

We assume familiarity with the facts and prior proceedings set forth in our prior opinion. 462 F.2d 673.

notes indicate that the terms being negotiated through him were charterhire, the length of the charter, and overtime and petties; that the charterer would be Hellenic; that the Mobiltime form charter "sub details"[2] would be used, excluding certain clauses; and that a suitable drydock clause would be worked out with sufficient advance notice. Other terms also were reflected in the notes.

During the negotiations, De Salvo informed H.T. that Germano required a guarantee. H.T. replied that "appropriate guarantees" would be given and that Hellenic was a subsidiary of National.

Following the negotiations, De Salvo sent telexes to both parties confirming the fixture of the Oswego Reliance and setting forth the agreed upon terms (the fixture telex).[3]

The telex was received by National at 5:36 P.M. It was studied by H.T. and Spears. Both testified that they understood it, including its use of the term "fixed" which meant the conclusion of a negotiation. Neither H.T. nor Spears contacted Poten & Partners to comment on or to correct the fixture telex.

All of the above events took place on the afternoon of March 17, 1971. No direct communication between H.T. and Germano ever took place. All negotiations were conducted through De Salvo.

On the next day, March 18, De Salvo and Germano drew up a working copy of the charter party and a proposed dry-

---

**2.** Clause 37 of the Mobiltime form contained the arbitration clause which Interocean seeks to enforce:

"Any dispute arising under this Charter shall be settled by arbitration in New York/London. The party requesting arbitration shall serve upon the other party a written demand for arbitration with the name and address of the arbitrator appointed by it, and such other party shall within twenty (20) days thereafter appoint an arbitrator, and the two arbitrators so named, if they cannot agree, shall appoint a third, and the decision or award of any two shall be final and binding upon the parties. Should the party upon whom the demand for arbitration is served fail or refuse to appoint an arbitrator within twenty (20) days, the single arbitrator shall have the right to decide alone, and his decision or award shall be final and binding upon the parties. The arbitrators shall have the discretion to impose the cost of the arbitration upon the losing party, or divide it between the parties on any terms which may appear just. Any decision or award rendered hereunder may be made and entered as a rule or judgment of any Court, in any country, having jurisdiction."

**3.** The telexes were identical except for the addresses and a notation concerning commissions payable by Interocean to Poten & Partners:

"THEOTRAN NY [or BETHLEHEM NYC] POTEN AND PARTNERS INC MAR 17 1971 ATTEN: MR. H. THEODORACOPULOS [or MR. TONY GERMANO] CONFIRM HAVING FIXED FOR YOUR ACCOUNT TODAY AS FOLLOWS:

OWNER: INTEROCEAN SHIPPING COMPANY CHARTERER: HELLENIC INTERNATIONAL SHIPPING S.A. OF PANAMA SUBSIDIARY OF NATIONAL SHIPPING AND TRADING WITH APPROPRIATE LETTER OF GUARANTEE. 'OSWEGO RELIANCE' 49,283 DWT 39 FT 5/8 INCHES DRAFT CUBIC 98 PERCENT 1,968,842 3 PUMPS 1300 TWPH EACH 16.5 KNOTS ON 100 BUNKER C PER DAY DELIVERY/REDELIVERY PG EXCLUDING FAO AND ABADAN LAYCAN MARCH 31/APRIL 15 1971 ETA APRIL 1, 1971 CRUDE AND/OR DPP MAX 3 GRADES WITHIN NATURAL SEGREGATIONS MAINTAINING HEATING 135 DEG F COILED WING TANKS ONLY TRADING WORLDWIDE WITHIN IWL EXCLUDING COMMUNIST COMMUNIST CONTROLLED CHINA, NORTH VIETNAM, NOR KOREA CUBA PERIOD ONE YEAR PLUS OR MINUS 30 DAYS MOBILTIME EXCLUDING CLAUSES 9, 12AII, 12BII, 12BIII SUITABLE DRYDOCK CLAUSE TO BE WORKED OUT FOR NOVEMBER DRYDOCKING ABOUT 15 DAYS WITH PROPER NOTICES PERFORMANCE REVIEW EVERY SIX MONTHS OVERTIME AND PETTIES $750. PER MONTH RATE 5.60 PER DWT PER MO PAYABLE U S DOLLARS IN NEW YORK THANK YOU FOR THE OPPORTUNITY TO CONCLUDE THIS BUSINESS THEOTRAN NY [or BETHLEHEM NYC plus Commissions]"

dock clause. This clause required the charterer to guarantee to place the vessel in a position so that it could be drydocked in November 1971 in Portugal, Spain or Japan. These documents were sent to Interocean and National the following day.

H.T. received the proposed charter party on Monday, March 22. He called De Salvo and asked him for two modifications: (1) to broaden the delivery range from the Persian Gulf to include the Red Sea; and (2) to permit trading with Communist China. Interocean agreed to the first modification but could not agree to the second because the crew was Nationalist Chinese. H.T. made no mention of the drydock clause.

Backing up for a moment, on March 18 or 19, De Salvo had asked H.T. if he wanted to subcharter the Oswego Reliance. H.T. replied that he wanted to subcharter the vessel to Chevron for a single voyage. Chevron, however, would not consider the vessel unless she had Tovalop[4] insurance which she did not. H.T. requested De Salvo to ask Germano to obtain such coverage for the Oswego Reliance.

This was the first time Tovalop had been mentioned. The Mobiltime form charter was printed in 1967. It did not refer to Tovalop which did not come into effect until 1969.

De Salvo relayed H.T.'s request to Germano on Friday, March 19. Germano informed De Salvo that the entry of the Oswego Reliance into Tovalop would require the entry of Bethlehem's entire fleet and that he would have to check with his principals.

On Tuesday, March 23, Bethlehem acceded to H.T.'s request and entered its entire fleet into Tovalop. Germano so informed De Salvo who relayed the information to H.T. Bethlehem stated that the cost was to be at charterer's expense but H.T. insisted that it be at owner's expense.

Returning to the drydock clause, it was not until the afternoon of March 23, after H.T. had gone on vacation, that Spears informed De Salvo that this clause was unacceptable because he was unable to guarantee the position of the vessel in November 1971. De Salvo then asked for a counter-proposal to give to the owners. Spears did not give De Salvo a proposed clause until about 5:15 P.M. That proposed clause provided that the charterer would "do all possible" to place the vessel "in the UKC MED or Far East area" for drydocking between October 15 and December 15, 1971.

Although Spears 'had told De Salvo that this clause was one which Hellenic "could .live with," at 9 A.M. the next morning, March 24, he called De Salvo and asked him whether he had conveyed the clause to Germano as yet. De Salvo said that he had not because it had been received after business hours the previous day. Spears then told De Salvo not to transmit the clause to Interocean, that the deal was finished, that there was no agreement to charter the Oswego Reliance and that it was too late for an agreement.

Nevertheless, later that same morning, De Salvo called Spears and informed him that Interocean had agreed to bear the cost of Tovalop as H.T. had insisted and that Interocean had agreed to the language of Spears' drydock clause.

At about 11 A.M. on March 24, National telexed De Salvo as follows:

"YOU HAVE BEEN PREVIOUSLY ADVISED THAT DUE TO THE ABSENCE OF MEETING OF THE MINDS OF THE PARTIES REGARDING ALL DETAILS NECESSARY TO A COMPLETED CHARTER AGREEMENT NEGOTIATIONS HAVE BEEN TERMINATED WITHOUT MUTUAL AGREEMENT."

The telex further stated that De Salvo's last attempt to agree belatedly to disputed contractual details "in no way is bind-

---

4. Tovalop is an acronym for Tanker Owners Voluntary Agreement which relates to liability for oil spills.

ing or agreeable to our principals since negotiations terminated earlier." De Salvo telexed this message to Germano.

Later that same day, Interocean sent a telex to Poten & Partners to be relayed to National. This telex stated that Interocean considered the Oswego Reliance chartered and intended to hold the charterers to the charter party. It rejected National's claim that there was no meeting of the minds:

> "RATHER AS IS NORMAL PRACTICE WE WERE ATTEMPTING TO ARRIVE AT MUTUALLY SATISFACTORY LANGUAGE FOR TWO RELATIVELY MINOR POINTS."

The telex went on to state that the "item which caused the most delay was Tovalop" which "came up a day or two after the fixture" which did not mention Tovalop. The telex noted that in the "spirit of cooperation" Bethlehem had entered its entire fleet in Tovalop, and added:

> "AT NO TIME WAS ANY LIMITATION PUT ON OUR EXCHANGES AND WE BELIEVE DISCUSSIONS PROCEEDED BETTER THAN NORMALLY FOR A CHARTER OF THIS DURATION."

Interocean directed Poten & Partners to prepare for Interocean's signature the charter party which was to include National's proposals concerning delivery and drydocking.

On March 25, 1971, National replied by telex that it had transmitted Interocean's message to its principals and had been "instructed to reply" that Interocean's statements were self-serving and contrary to elementary contract law, that Hellenic had reiterated that there had been no meeting of the minds and that the unsettled points were not minor:

> "HELLENIC INTERNATIONAL CONSIDERED THESE OUTSTANDING POINTS AS INTEGRAL PARTS OF A PROPOSED AGREEMENT TO WHICH BOTH PARTIES MUST MUTUALLY AGREE IN ORDER TO HAVE A CONTRACT."

The telex was signed "National Shipping and Trading Corp. as agents for Hellenic International." National sent a copy of this telex to its counsel.

On March 24, Poten & Partners had sent the charter party which it had prepared to Interocean which executed it. When it was presented to National and Hellenic, they refused to execute it.[5]

By letter dated May 20, 1971, Interocean demanded that Hellenic and National proceed to arbitration in accordance with the terms of the charter party alleged to have been agreed to on March 17, 1971. They refused to do so. On July 28, 1971, Interocean filed a petition in the Southern District of New York to compel arbitration pursuant to the terms of the Mobiltime charter party, and claimed $1.4 million damages caused by appellants' alleged breach of the charter party. Appellants' answer denied that any agreement existed and demanded a trial.

On December 30, 1971, the district court held, on the basis of affidavits alone, that the making of the arbitration agreement was not in issue and granted Interocean's petition.

On June 23, 1972, we reversed the district court's order and remanded for further proceedings. 462 F.2d 673. We concluded that the making of the arbitration agreement was in issue within the meaning of Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4 (1970). 462 F.2d at 676–78. In reaching this conclusion, we found that there was enough

---

5. It is significant to note that this charter party dispute probably is attributable to the state of the tanker market at the time of these events. Between March 17 and March 24, 1971, the tanker market fell drastically from $5.60 (the rate for this charter) to $3.00 per deadweight ton per month. If Hellenic planned, as it apparently did, to subcharter the tanker, which was to be delivered between March 31 and April 15, 1971, it was destined to sustain a substantial loss if forced to adhere to this charter party. On the other hand, the charter party was extremely favorable to Interocean under prevailing market conditions. Understandably, Hellenic wanted out, Interocean wanted in.

**534**

evidence in the record to entitle National and Hellenic to a trial on whether a valid charter agreement existed and whether National was a party to that agreement. 462 F.2d at 678. We held that there were essentially three issues of fact to be determined:

(1) Whether there was a meeting of the minds of the parties with respect to the essential terms of a charter party. 462 F.2d at 676–77.

(2) Whether Poten & Partners had authority to bind National and Hellenic to the charter party. 462 F.2d at 677.

(3) Whether National was a party to the charter party and hence a party to the arbitration agreement contained therein. 462 F.2d at 677–78.

On remand, the district court held a four day evidentiary hearing in April and May 1973. On March 4, 1974, it filed a comprehensive opinion in which it concluded:

"The overwhelming evidence, both testimonial and documentary, is that there was a charterparty agreement entered into by the parties, the essential terms of which were contained in the fixture letter which bound both, and that performance by the charterer HELLENIC was guaranteed by NATIONAL, and that the guarantee was set forth in the fixture letter signed by the broker, who was the agent for both parties . . . ."

The court granted the petition to compel arbitration and directed both National and Hellenic to proceed to arbitration in accordance with the Mobiltime charter arbitration clause.

The instant appeal by National and Hellenic followed.

## II. EXISTENCE OF THE CHARTER PARTY

The principal question of fact before the district court on remand was whether a valid charter party existed, i. e. whether there was a meeting of the minds on its essential terms. 462 F.2d at 676–77. The court answered this question in the affirmative. It found that there was an oral meeting of the minds on March 17, 1971, which was reflected in the fixture telex sent to both parties by De Salvo on the same day. We agree.

■ Whether there was a meeting of the minds is a question of fact. Appellants urge that we set aside the findings of fact of the district court as clearly erroneous under Fed.R.Civ.P. 52(a). We decline to do so. The factual determinations were made by an able and experienced trial judge. Our careful review of the entire record satisfies us that Judge Ryan's findings that a valid charter party existed were not clearly erroneous. They were supported by substantial evidence.

### Issues of Credibility

■ The court's findings were based in large measure on its resolution of issues of credibility with respect to witnesses called by both sides. The task of resolving conflicting testimony is peculiarily within the province of the trial court. In the Matter of Grace Line Inc., 517 F.2d 404, 406–07 (2 Cir. 1975); Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 980 (2 Cir. 1942). For example, the trial court was in the best position to evaluate H.T.'s destruction of his notes concerning this transaction even after he had notified his attorneys of the impending dispute. And all of the testimony appropriately was weighed in light of the falling tanker market. See note 5, supra.

### Differences Between Telex and Working Copy of Charter Party

■ Many of appellants' claims of error are directed at differences between the telex and the working copy of the charter party prepared by De Salvo and Germano and sent to H.T. on March 19. They relate to such details as trading limits, speed, performance, penalties and method of payment. We believe that the terms of the telex or De Salvo's notes

embodying the proposal which were relayed by De Salvo to H.T. during the course of the negotiations should be viewed as having merged in the subsequent written document, whether favorable to one side or the other. The party that wanted a provision which was omitted or altered could have pressed for its inclusion in the final written instrument. *Christman v. Maristella Compania Naviera*, 349 F.Supp. 845, 854 (S.D.N.Y.1971), *aff'd on district court opinion*, 468 F.2d 620 (2 Cir. 1972). The differences upon which appellants focus on appeal did not vitiate the agreement which the district court found the parties had reached through De Salvo on March 17. *Orient Mid-East Lines v. Albert E. Bowen, Inc.*, 458 F.2d 572, 574 (2 Cir. 1972); *Gardner v. The Calvert*, 253 F.2d 395, 398–99 (3 Cir.), *cert. denied*, 356 U.S. 960 (1958). Similarly, the claimed inconsistencies between De Salvo's notes and the telex were mere clerical errors, not evidence of lack of agreement. *Christman v. Maristella Compania Naviera, supra*, 349 F.Supp. at 854–57. We hold that the district court was not clearly erroneous in minimizing the weight to be given to such variations.

### Interpretation of Phrase "Mobiltime sub details"

■ In like vein, the district court as the trier of the facts was entirely justified in its interpretation of the phrase "Mobiltime sub details" as used in De Salvo's notes to specify the basic charter party document to be used by the parties. Appellants contend on appeal, as they did below, that the phrase meant that the parties had placed a condition on the negotiations, i. e. that they had agreed on the printed Mobiltime form but that the charter party was still subject to agreement as to the details of that form. H.T. so testified.

The court rejected this interpretation and credited De Salvo's testimony to the effect that "sub details" meant placing the agreed terms of the fixture in the form and eliminating the inapplicable ones. De Salvo further testified that the phrase contemplated filling in the form with the various technical specifications of the chartered vessel. In short, according to De Salvo, "sub details" meant filling in the blanks—not reviewing the whole negotiations again.

The resolution of this conflicting testimony as to the meaning of "sub details" in the negotiations for the charter of the Oswego Reliance was the function of the district court as the trier of the facts, not the function of this Court. Our role is limited to holding, as we do, that our review of the testimony satisfies us that the district court was not clearly erroneous in finding that "sub details" did not mean that a charter party had not been agreed upon.

### Delivery Range and Insurance

■ In our opinion on the prior appeal, we directed the district court's attention to two terms of the charter party—delivery range and insurance—and suggested that it make findings as to whether there was a meeting of the minds on these terms and whether they were essential to the charter party. 462 F.2d at 677. Appellants contend that the district court was clearly erroneous in finding that there was a meeting of the minds as to both terms.

The Persian Gulf was indicated as the delivery range both in De Salvo's notes which were relayed to H.T. during the telephone negotiations on March 17 and in the fixture telex. H.T. did not object to this term at that time. It was not until he received the working copy of the charter party on March 22 that he asked De Salvo to ask Germano to modify the delivery range to include the Red Sea. This was too late. Hellenic already was bound by the agreement of March 17. We find no support for appellants' contention that there was no meeting of the minds as to delivery range. In any event, Interocean eventually agreed to H.T.'s new demand in this respect.

Appellants' contention that there was no meeting of the minds as to insurance presents a closer question. The matter of insurance was not raised in the De

Salvo negotiations and was not mentioned in the telex. It first arose when the working Mobiltime form agreement was sent to H.T. Clause 23 of this form which required a Protection and Indemnity (P&I) entry was deleted because Bethlehem was a self-insurer. The district court found that, although National and Hellenic had never dealt with Interocean before, knowledge of Bethlehem's self-insurance (and hence Interocean's) could be imputed to National and Hellenic.

There was ample basis in the record to support the inference drawn by the district court in this respect. H.T. and Spears were thoroughly experienced in the field. Appellants' experts conceded Bethlehem's reputation for solvency and the fact that some large ship owners were self-insured. As the district court pointed out, moreover, if appellants had had any doubt as to the insurance to be provided by Interocean, they certainly would have raised the point immediately upon receipt of the working Mobiltime form agreement with the insurance clause deleted.

*Tovalop*

■ As to Tovalop, this issue was never raised by appellants until they attempted to subcharter the vessel. In 1971, Tovalop was still relatively new. It was not included in the Mobiltime form which was specified both in the telephone negotiations and the telex. Appellants' belated attempt to raise the Tovalop issue after March 17 did not necessarily mean that there was no agreement with respect to it, but more likely that it was outside the scope of the agreement. As the district court found:

"It was not a condition precedent, nor even a condition subsequent, that HELLENIC be able to subcharter the OSWEGO RELIANCE. De Salvo testified, and this Court agrees, that,

even if Bethlehem Steel had refused to obtain Tovalop, he considered that there was a charter on the OSWEGO RELIANCE . . . ."

In any event, Bethlehem eventually did agree to obtain Tovalop at its own expense. Indeed, it registered its entire fleet with Tovalop in order to comply.

*Drydocking*

■ In our prior opinion, we noted that Interocean had conceded that no agreement was reached on March 17 as to drydocking and we suggested that the district court determine whether this was an essential term of a charter party. 462 F.2d at 676–77. On remand, the court held that the fact that the fixture telex had left the drydock clause to be worked out in the future[6] did not indicate a lack of agreement on the charter of the Oswego Reliance.

The most accurate description of the negotiations with respect to drydocking is that there was an agreement on March 17 not to agree on this term. The testimony indicated that drydocking customarily was accomplished solely at the owner's expense. The owner paid the cost of drydocking and the cost of any deviation in getting the ship to drydock, while the charterer was relieved from payment of hire during this period. Indeed, Paragraph 11 of the Mobiltime form so specified.

The district court concluded that it was to appellants' benefit and not an uncommon business practice to leave the drydock provision open until the position of the vessel could be approximated for the period drydocking was required. The district court was not clearly erroneous in finding that lack of agreement on March 17 as to the specifications of the drydock clause was not fatal to agreement on the charter party.

We hold that the district court's findings that there was a valid charter party which contained all essential terms were

**6.** The fixture telex provided:

"SUITABLE DRYDOCK CLAUSE TO BE WORKED OUT FOR NOVEMBER DRY-

DOCKING ABOUT 15 DAYS WITH PROPER NOTICES."

not clearly erroneous and were supported by substantial evidence.

## III. DE SALVO'S AUTHORITY

■ Another major question we left for the district court on remand was that of De Salvo's authority to act for National and Hellenic. We indicated, on the record before us on the prior appeal, that we had some doubt as to whether De Salvo was authorized to act for Hellenic and National or whether he acted solely for Interocean.[7] We suggested that resolution of this issue would require evidence on the relationship between the various parties as well as on the customary practice of charter brokerage. 462 F.2d at 677.

On remand, the court found that De Salvo was authorized to act on behalf of both Hellenic and National, as well as Interocean. These findings were based on the language "for your account" in the fixture telex which was sent to both National and Interocean;[8] the entire course of negotiations which took place entirely through De Salvo; his past business dealings with H.T.; H.T.'s request to "bring me a firm offer"; his statement to De Salvo to the effect that "You are confirmed"; and the custom of the trade.

The court considered precisely those factors which we indicated in our prior opinion were relevant, plus the actual events of the specific transaction in question. On the basis of H.T.'s conduct,

the relationship of the parties and the custom of the industry, the court correctly drew the inference that H.T. had authorized De Salvo to act for National and Hellenic. See Restatement (Second) of Agency §§ 15, 26, 34 (1958). It is immaterial that De Salvo thought of himself as a "broker" and not an "agent" of Hellenic or National or Interocean, or that H.T. did not intend to make De Salvo an agent. Agency is a legal concept which depends on the manifest conduct of the parties, not on their intentions or beliefs as to what they have done. Restatement (Second) of Agency § 1, comment *b* (1958).

We hold that the district court correctly analyzed the relevant factors and properly concluded that De Salvo had authority to act for Hellenic and National as well as for Interocean.[9]

## IV. SCOPE OF THE DISTRICT COURT'S ORDER

■ The district court's findings that De Salvo had authority to act for Hellenic and National meant that the signature of Poten & Partners on the fixture telex was sufficient to bind them to the contents of the telex. The court correctly pointed out that the telex served a dual function: on the one hand, it was the contract between Interocean and Hellenic; on the other, it evidenced a guarantee in writing subscribed by the agent of the party to be charged, National, and thus was enforceable under the New York statute of frauds, N.Y.

---

7. See note 8, *infra*.

8. Our prior opinion questioned whether the statement in the fixture telex "Confirm having fixed for your account today . . . ." indicated that De Salvo was acting solely for Interocean. 462 F.2d at 677. The district court, however, found this to be one item that established his authority. This finding is not contrary to our prior opinion.

   The comment in our prior opinion was based on the rather confused state of the record then before us. At that time it appeared that the fixture telex was addressed solely to Interocean. The fact is that the identical telex (except for addressees and a notation on Interocean's

copy as to commissions owed by Poten & Partners) was sent to National and Interocean. Notwithstanding our comment, therefore, the district court clearly was correct in regarding this phrase as one item supporting De Salvo's authority to act for National and Hellenic.

9. The reliance by the district court on the same factors to establish De Salvo's authority to bind both National and Hellenic was proper, since it is clear that throughout the negotiations H.T. acted in two capacities: one, as a representative of National as agent for Hellenic; the other, as a representative of National qua National.

General Obligations Law § 5–701(2) (McKinney 1964), which we held applicable to this transaction in our prior opinion. 462 F.2d at 678.[10] See *La Mar Hosiery Mills, Inc.* v. *Credit and Commodity Corp.*, 28 Misc.2d 764, 216 N.Y.S.2d 186 (N.Y.City Ct., 1961) (telegram held sufficient to comply with the statute of frauds). We hold that the district court's conclusion was correct in both respects.[11]

This brings us to the only part of the district court's decision with which we disagree. We believe that the court erred in failing to differentiate between the discrete roles that Hellenic and National respectively played in the negotiations. While the court properly ordered Hellenic to arbitrate since Hellenic was a party to the charter agreement, we hold that it erred in ordering National to arbitrate since National was only a guarantor and not a party to the agreement.

There can be no question that if a charter party existed (and we have held above that it did), Hellenic properly was ordered to proceed to arbitration. We do not understand appellants to claim the contrary. The telex, signed by Poten & Partners, embodied the Mobiltime agreement which contained an arbitration provision. Accordingly, there was a written arbitration clause enforceable under Section 4 of the Federal Arbitration Act by an order requiring Hellenic, a party to the agreement, to proceed to arbitration.

National, however, was not a party to the charter agreement but a mere guarantor. Whether a guarantor can be compelled to arbitrate on the basis of an arbitration clause in the main contract must be considered separately from the question of a party's obligation to arbitrate.

The only indication that the district court considered this question is its statement:

"I . . . find that it was the understanding of the parties, through De Salvo and H.T., that NATIONAL would give the guarantee on behalf of HELLENIC and so bind itself to the charter party . . . ." (footnote omitted).

If this was meant to be a finding of fact that National had bound itself to the charter party by its acts, we find no support for it in the record. The fixture telex stated:

"CHARTERER: HELLENIC INTERNATIONAL SHIPPING S.A. OF PANAMA SUBSIDIARY OF NATIONAL SHIPPING AND TRADING WITH APPROPRIATE LETTER OF GUARANTEE."

De Salvo's notes indicated only that Hellenic was a subsidiary of National. The Mobiltime form which National refused to execute refers to National only as the charterer's agent. There is no evidence that National acted in any capacity except as a disclosed agent for Hellenic. As we held on the prior appeal, this is not enough to bind it to the arbitration clause in the charter agreement. 462 F.2d at 678.

---

10. Although appellants stress the purported discrepancy between De Salvo's testimony that H.T. said a letter of guarantee *could* be given and the district court's statement that H.T. said that a letter *would* be given, we regard the difference as trivial. The intent that a letter of guarantee be given clearly is present under either version. It is that intent which governs. *Savoy Record Co.* v. *Cardinal Export Corp.*, 15 N.Y.2d 1, 4–5, 203 N.E.2d 206, 254 N.Y.S.2d 521, 524 (1964); *Salzman Sign Co.* v. *Beck*, 10 N.Y.2d 63, 66–67, 176 N.E.2d 74, 217 N.Y.S.2d 55, 57 (1961); *Mencher* v. *Weiss*, 306 N.Y. 1, 4, 114 N.E.2d 177, 179 (1953). H.T.'s subsequent statement to De Salvo that "You are confirmed" properly was construed by the district court to mean that H.T. was committing National to give the guarantee.

11. The comment in our prior opinion, 462 F.2d at 678, that National's guarantee was not in writing, like the comment referred to in note 8, *supra*, was based on the incomplete record before us at that time in which the authority of De Salvo to act for National was unclear. On remand, the district court found that authority and correctly concluded that the telex was a writing which satisfied the New York statute of frauds. N.Y. General Obligations Law § 5–701(2) (McKinney 1964).

■ If the language of the district court quoted above was meant to be a statement of law that National, by agreeing to act as a guarantor, bound itself to the arbitration clause in the main agreement, we hold it to be error. A mere guarantor of a charter party generally cannot be compelled to arbitrate on the basis of an arbitration clause in the main agreement since it is not a party to that contract. *Taiwan Navigation Co.* v. *Seven Seas Merchants Corp.*, 172 F.Supp. 721 (S.D.N.Y.1959); see *Import Export Steel Corp.* v. *Mississippi Valley Barge Line Co.*, 351 F.2d 503, 506 (2 Cir. 1965); *Instituto Cubano De Estabilizacion Del Azucar* v. *T/V Golden West*, 246 F.2d 802 (2 Cir.), *cert. denied*, 355 U.S. 884 (1957); *Cia. Naviera Somelga, S.A.* v. *M. Golodetz & Co.*, 189 F.Supp. 90, 96 (D.Md.1960). Although it might be said that National agreed to arbitrate since its guarantee was in the fixture telex and thus was in the same document as the main agreement, that would be a fiction since the arbitration clause is in the Mobiltime agreement, not in the fixture telex. The district court itself pointed out:

> "The guarantee was not recited in the charter-party because it was not part of it; the guarantee of performance was really a separate agreement."

■ True, the mere fact that a party did not sign an arbitration agreement does not mean that it cannot be held bound by it. Ordinary contract principles determine who is bound. In an appropriate situation, the corporate veil may be pierced and a party may be held bound to arbitrate as the signatory's alter ego. *Fisser* v. *International Bank*, 282 F.2d 231, 233–34 (2 Cir. 1960). In view of the close familial relationship between Hellenic and National, this might be said to be a tempting case to hold National bound by the arbitration clause. But even if we viewed Hellenic as having no mind of its own, i. e., that it was completely dominated by H.T. and National, there is no evidence in the record before us that such control was used to perpetrate a fraud or something akin to fraud. Such a showing is a sine qua non to holding a non-signatory bound by an arbitration agreement. *Fisser* v. *International Bank, supra*, 282 F.2d at 238–40.

We modify the order of the district court by eliminating the direction that National proceed to arbitration.

As modified, the order of the district court is affirmed.