William **KIRKLAND**, Plaintiff,

v.

**SAPPHIRE INTERNATIONAL TOURING, LTD. and F. I. T. Car Hire, Inc., Defendants.**

**No. 65 Civ. 1503.**

United States District Court
S. D. New York.

Nov. 17, 1966.

**310**

Davis Polk Wardwell Sunderland & Kiendl, New York City, for plaintiff; J.

Roger Carroll, New York City, of counsel.

Smith & Steibel, New York City, for defendant Sapphire International Touring, Ltd.; Ludwig A. Saskor, New York City, of counsel.

## OPINION

McLEAN, District Judge.

Defendant Sapphire International Touring, Ltd. (Sapphire) moves to set aside two purported services of process upon it and to dismiss the action against it for lack of personal jurisdiction. One service was made in New York upon F. I. T. Car Hire, Inc. (FIT) as the alleged agent of Sapphire. The other was made upon Sapphire in England under the New York "long arm" statute (CPLR §§ 302, 313).

The action arises out of an auto accident which occurred in England on March 24, 1964. The complaint contains four counts against Sapphire.

The first count may be briefly summarized as follows. On March 17, 1964, Sapphire, through its agent FIT, contracted with plaintiff in New York to rent an automobile to plaintiff for use in England, to instruct plaintiff how to drive a motor vehicle in England, and to drive the vehicle while instructing plaintiff. In accordance with this agreement, Sapphire furnished the automobile and Jerri Tipper as a driver and instructor. She was driving the car on March 24, 1964. Plaintiff was a passenger in it. In the vicinity of Southampton, England, the automobile collided with another motor vehicle because of the negligence of Mrs. Tipper. Plaintiff sustained personal injuries to his damage in the sum of $350,000.

The second count alleges all over again that on March 17, 1964, Sapphire, through its agent FIT, contracted with plaintiff in New York to rent an automobile to plaintiff to be used in England, and agreed to instruct plaintiff how to drive and to supply a driver instructor. This count then realleges all the allegations of the first count with respect to the happening of the accident. It is

hard to see what this count adds to the first.

The third count omits any reference to a contract between the parties, and alleges merely that while plaintiff was a passenger in a vehicle owned by Sapphire and operated by its employee Mrs. Tipper, he was injured by reason of Mrs. Tipper's negligence in so operating the vehicle that it collided with a truck.

The fourth count repeats the allegation that on March 17, 1964, Sapphire, through its agent FIT, contracted in New York to furnish plaintiff an automobile for his use in England. This count adds the allegation that it was part of this agreement that Sapphire would obtain a "standard policy of public liability insurance as issued in the State of New York during the year 1964, or the equivalent," that Sapphire failed to do so, and that as a result of this breach of the contract plaintiff, while riding in the vehicle, "was not protected by a policy of public liability insurance," and hence was damaged in the sum of $350,000.

Sapphire and plaintiff have each submitted affidavits in support of and in opposition to the motion. I considered it desirable to supplement the affidavits by holding a hearing at which testimony was taken and a number of exhibits were introduced.[1] Upon the basis of the affidavits and the evidence at the hearing, I find the facts to be as follows.

Sapphire is a corporation organized under the laws of the United Kingdom with its principal place of business in London. Its business is the renting of automobiles, both chauffeur driven and "self driven," i. e., to be operated by the hirer. Sapphire is not qualified to do business in New York. It has no office here. It is not listed in the New York telephone book. It has no bank account or employees in New York.

FIT is a New York corporation. Its principal place of business is in New York. Its business is renting automobiles to Americans for use in Europe. Neither Sapphire nor any individual connected with Sapphire owns any stock in FIT. Sapphire has not paid any part of FIT's operating expenses. Sapphire has given no instructions to FIT as to how to operate its business.

In November 1963 Rosen, president of FIT, had a conversation in London with officers of Sapphire in the course of which it was agreed between them that FIT would "work with" Sapphire to send business to Sapphire. This agreement was oral. There is no written agreement between these companies. The word "agent" was not mentioned, as far as Rosen recalls. He testified that he told the Sapphire officers that he "would give it a try," and that for his English business he would "use Sapphire instead of another operator." Nothing was said as to FIT's power to bind Sapphire to any commitment to a customer.

After this conversation, the practice followed by the two companies until they ceased doing business with each other sometime in 1965, was substantially as follows:

Sapphire furnished FIT with a copy of Sapphire's price list or "tariff," i. e., a schedule of its rental charges. FIT in New York published a booklet under its own name labeled "Foreign Car Hire and Purchase—1964." The booklet contained rental rates for various types of vehicles in various countries. The page for England set forth the rates which Sapphire had previously furnished to FIT. Sapphire's name was not mentioned. The rates purported to be FIT's rates.

There appear to be several steps and several different sets of people involved in what would seem at first blush to be the relatively simple operation of renting a car for use in England. The normal practice generally followed at the time in question was this: The American would-be traveler goes to his travel agent and tells him that he wants to rent an automobile of such and such a make and model for use in England. The

1. At the request of the parties this hearing, originally scheduled for September 16, was adjourned to November 9.

travel agent so informs FIT, usually by telephone. FIT then communicates with Sapphire and inquires whether such a car will be available at the specified time. If Sapphire replies in the affirmative, FIT then makes out a voucher in quintuplicate and sends two copies to Sapphire, who signs one and returns it to FIT. FIT sends two copies to the travel agent, one for the travel agent and one to be delivered by him to the traveler.

On the back of this voucher the following legend is printed:

> "F.I.T. Car Hire Inc. act only as the agents for the owners or contractors providing the services listed overleaf and, as such, accept no liability whatsoever for any loss, delay, accident, injury or damage to, or in respect to, any person or property howsoever caused or arising in connection with the services rendered by the said owners or contractors."

Sapphire knew that this legend appeared on FIT vouchers. It has never objected to its use by FIT.

If the request is for a self-drive automobile, a fourth step is necessary, inasmuch as Sapphire does not own any such automobiles itself. Sapphire proceeds to hire one from an English car rental organization.

The traveler, who presumably knows little or nothing about all this machinery, is furnished by his travel agent with a copy of the voucher. He proceeds to the pre-arranged point of delivery in England, finds the car waiting for him, and takes delivery of it. When his trip is over, he returns the car to the place of surrender in England.

Sapphire bills its rental charges to FIT at Sapphire's tariff rates, less a 20 per cent discount. Sapphire looks only to FIT for payment, it has no financial dealings with the travel agent or the traveler. FIT then bills the travel agent at FIT's published tariff rates (which are the same as Sapphire's) less 10 per cent. In the rare case in which the traveler deals directly with FIT, eliminating the travel agent, FIT bills the traveler at its full tariff rate. The difference between what FIT pays to Sapphire and what FIT bills to the travel agent or the traveler, i. e., 10 per cent or 20 per cent, as the case may be, is FIT's profit on the transaction.

If the traveler or the travel agent on his behalf requests that a temporary driver be supplied with the car to instruct him in the technique of driving on the left side of the road in England, FIT passes on this request to Sapphire. Sapphire makes an extra charge to FIT for this service. The charge is referred to as "pilotage." FIT in turn charges the travel agent or the traveler, as the case may be, for the pilotage.

As to insurance, the situation is as follows: FIT's price list states, "Price includes * * * insurance." Insurance is defined on the price list as "public liability; property damage; fire; theft; and collision with $42.00 deductible." Normally the traveler fills out an application for this insurance before he leaves New York. The application is on a printed form entitled "Proposal for Hirer Driving Insurance." The proposal is addressed to British Merchants' Insurance Company Ltd., an English insurance company. Sapphire supplies FIT with blank forms of these applications. FIT sends them to the traveler or his travel agent upon request. If the traveler requests "full insurance coverage," this means that there is no $42 deductible clause with respect to the collision insurance. There is an extra charge if the deductible clause is omitted. Sapphire bills FIT for any extra charge with respect to insurance and FIT in turn bills the travel agent or the traveler. This insurance covers only the traveler, i. e., the "hirer," while he is driving the rented car. It does not cover any other driver.

The evidence is unsatisfactory as to the volume of business done between Sapphire and FIT prior to the dealings with plaintiff in March 1964. An officer of Sapphire testified that he could not say how many cars Sapphire had rented to FIT during that period. The best that Rosen could do was to say that between 300 and 400 transactions occurred during

the entire period of the dealings between the two companies. He could not say how many of these occurred before March 1964. No records on the subject were produced.

I come now to the particular transaction here involved which, because of the exigencies of time, did not follow quite the usual pattern. Very shortly before his departure for Europe plaintiff, according to his testimony, communicated with a travel agent, Condliffe, and told him that he wanted to rent a self-drive car in England to meet him in Southampton upon the arrival of the Queen Mary on March 24, 1964. He said that he wanted "full insurance coverage" and also "pilot service."

Condliffe communicated with Rosen of FIT. For some reason, whether because Condliffe failed to mention it or because Rosen failed to note it does not appear, Rosen was not aware of any request for pilot service. As to insurance, he understood that what plaintiff wanted was "full collision coverage," i. e., no $42 deductible clause. Since plaintiff was leaving almost immediately, there was no opportunity to have him fill out the insurance application. Nor was there time for Rosen to follow his usual practice of communicating with Sapphire to inquire whether a car would be available.

On March 17, 1964, FIT sent to Sapphire its usual voucher. It read:

"Please provide MR. WILLIAM KIRKLAND (Party of 2)

With A u-drive Ford Corsair sedan, or comparable, from March 24 early a. m. Southampton dockside (arr. 'QUEEN MARY'—First class cabin M38), to April 4 London (Grosvenor House).

Full collision coverage to be provided.

NO payments whatsoever to be collected from client.

Payment instructions
F.I.T.
RESPONSIBLE" [2]

The voucher said nothing about pilot service.

At the same time Rosen wrote a letter to Sapphire stating:

"Client is leaving tomorrow so there is no chance to make any preliminary arrangements, nor did I have an opportunity to get Mr. Kirkland to complete an insurance form. The form will have to be brought by your man to Southampton and completed there."

When plaintiff debarked from the Queen Mary in Southampton on March 24, 1964, he found an automobile awaiting him in charge of Mrs. Tipper. Mrs. Tipper was not an employee of Sapphire. She was employed by a car rental organization from whom Sapphire had hired the car in order to be in a position to make it available to plaintiff.

Mrs. Tipper had with her the usual insurance proposal form. Plaintiff filled out part of this form. Other portions were apparently filled out by Mrs. Tipper. Plaintiff signed it and gave it to Mrs. Tipper.

Plaintiff asked Mrs. Tipper to drive him out of Southampton as far as Salisbury. Mrs. Tipper agreed to do so. On the way to Salisbury, while she was driving, the accident occurred. The accident ended plaintiff's trip very shortly after it had begun. Sapphire made no charge to FIT for the car rental and FIT made no charge to Condliffe or plaintiff.

Although the insurance policy for which plaintiff applied in Southampton, and which presumably he obtained, was not introduced in evidence, it is apparently undisputed that the policy did not apply to this accident because Mrs. Tipper was driving. Whether or not Sapphire has any other insurance to which plaintiff might resort in the event that he ultimately recovers a judgment against Sapphire was never explained.

Plaintiff is a citizen of Connecticut. Jurisdiction over the subject matter in this action is based on diversity

---

**2.** Underscoring and capital letters in the original.

of citizenship. Consequently, questions of personal jurisdiction are governed by New York law. Arrowsmith v. United Press International, 320 F.2d 219, 6 A.L.R.3d 1072 (2d Cir. 1963)

Plaintiff claims that the service in New York upon FIT is valid because at the time of the service, i. e., May 20, 1965, Sapphire was doing business in New York through FIT as its agent. This theory necessarily also presupposes that FIT was then a "managing or general agent" upon whom service could be made under CPLR § 311.

In the first place, it is by no means clear that there was any relationship at all between Sapphire and FIT on May 20, 1965. The evidence is vague as to precisely when their relationship terminated. An officer of Sapphire testified that Sapphire stopped doing business with FIT in "late 1964 or early 1965." Rosen testified that FIT stopped doing business with Sapphire in "mid 1965." Sapphire's ledger card of the FIT account on its books shows charges to that account subsequent to May 1965 but no explanation of these charges was offered and there is nothing to show whether or not they related to transactions which had occurred prior to that date. The Marshal's return of service notes that service was made on Rosen despite his protest that he was not an agent of Sapphire. Apart from all other considerations, the evidence seems to me insufficient to establish that the relationship between Sapphire and FIT, whatever it was, was actually in existence at the time of the purported service.

I will not rest my decision solely on this ground, however. I will assume for the sake of argument that the relationship between Sapphire and FIT as it existed in 1964 continued until the date of service. On that assumption I will consider the merits of plaintiff's contention.

■ As presented by plaintiff, the question depends upon whether FIT was the agent of Sapphire. In my opinion it was not. FIT was an entirely independent company whose operations were not controlled by Sapphire. FIT sent car rental business to Sapphire. It contracted with Sapphire for the rental of the cars and agreed to and did pay Sapphire's charges for that rental. FIT sent car rental business to some 22 other car owners or "operators" in 18 other European countries. Its oral agreement to "work with" Sapphire amounted to nothing more than an assurance that for the time being, while FIT was "giving it a try," FIT would not do business with any other car operator in England.

In so concluding, I do not ignore the self-serving legend which FIT printed on the back of its vouchers. Such disclaimers of liability are apparently standard procedure in the travel business. Plaintiff himself put in evidence brochures issued by car rental or tour companies on both sides of the Atlantic, each of which stated that the company acted only "as agent," and accepted no responsibility for injury to the traveler. Indeed, even Sapphire claims to be only an agent and carries a statement to that effect in its current brochure.

■■ I am not required to pass upon the efficacy of these attempts to pass on to someone else all liability for any unpleasantness that may arise during the course of a rental. But it seems clear to me, and I so hold, that a man may not make himself an agent of another merely by calling himself one, when in fact he is an independent contractor. Nor do I believe that under the circumstances disclosed by the evidence here, Sapphire's failure to object to FIT's characterization served either to make FIT an agent or to estop Sapphire from showing that it was not.

In cases involving New York representatives of foreign hotels, cases which were stronger on their facts in favor of the purported service than the present case, the courts have nevertheless held the service invalid under New York law. Miller v. Surf Properties, Inc., 4 N.Y.2d 475, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958); MacInnes v. Fontainebleau Hotel Corp., 257 F.2d 832 (2d Cir. 1958)

Moreover, I am not persuaded that, even if FIT were an agent of Sapphire, it necessarily follows that the service is valid. Mere solicitation of business for a foreign company by a New York representative, even an exclusive representative, has been held insufficient to constitute doing business in New York.

See Mabuchi, Kameny & Smith, Inc. v. Horizon House, Inc., 64 Civ. 2040, S.D.N.Y. Nov. 17, 1964 (unreported) and New York cases therein cited.

I conclude, therefore, that the purported service in New York must be set aside.

I turn now to the "long arm" service upon Sapphire in England, which was made on July 2, 1965. The question here, under CPLR § 302, is whether plaintiff's claim arises from the transaction of business within New York by Sapphire. Doubtless in this instance we are concerned only with the state of affairs in March 1964 and it is immaterial whether Sapphire was transacting business in New York at the time of the service.

The question breaks down into two parts: (1) was Sapphire transacting business; (2) if so, does plaintiff's claim arise from such transaction of business?

As to the first question, it follows from my conclusion that FIT was not Sapphire's agent, that Sapphire was not transacting business in New York through FIT. The acts of FIT were its own acts, not Sapphire's, and hence they afford no basis for jurisdiction over Sapphire. Standard Wine & Liquor Co., Inc. v. Bombay Spirits Co., 25 A.D.2d 236, 268 N.Y.S.2d 602 (1st Dept. 1966); A. Millner Company, Inc. v. Noudar, Lda., 24 A.D.2d 326, 266 N.Y.S.2d 289 (1st Dept. 1966); Venard, Torbet & McConnell, Inc. v. Shamrock Broadcasting, Inc., N.Y.L.J. June 7, 1966, p. 16 (Sup.Ct.N.Y.Co. 1966).

It is thus unnecessary to reach the second question. I may note, however, that there is controlling authority for the proposition that even if FIT were Sapphire's agent, and even if Sapphire were transacting business in New York through FIT, plaintiff's claim for personal injuries does not arise from the transaction of that business within the meaning of CPLR § 302. Gelfand v. Tanner Motor Tours, Ltd., 339 F.2d 317 (2d Cir. 1964).

Plaintiff seeks to avoid this authority by contending that he has a claim not only for personal injuries but also for breach of a contract to provide him with pilot service and with insurance. As a matter of fact, the evidence at the hearing failed to establish either claim. There is no evidence that FIT ever agreed with plaintiff or his travel agent to furnish pilot service to plaintiff. Plaintiff's attorney conceded as much at the close of the hearing. As to insurance, it is equally clear, to my mind, that plaintiff failed to prove the allegation in his complaint that FIT agreed to furnish him a "standard policy of public liability insurance as issued in the State of New York during the year 1964." The only insurance involved here is insurance with an English insurance company. Plaintiff in fact signed his application for that insurance in England. Moreover, plaintiff also failed to show any agreement on the part of FIT to furnish him with insurance which would apply when anyone other than plaintiff was operating the car. At most, he proved that FIT agreed to provide the usual insurance applicable only to the hirer as driver, although in this instance the coverage was "full" in the sense that there was no $42 deductible clause in the collision insurance.

Perhaps upon this motion the court should not consider the merits of plaintiff's claim and should ignore the evidence as to what the contract actually was. Even on that approach, it may well be that plaintiff's contract claim, taken at its face value, is merely incidental to the tort claim, that the tort claim is the "gist" of the suit, and that therefore the contract claim cannot afford a basis of jurisdiction.

See Gelfand v. Tanner Motor Tours, Ltd., supra at 322.

I am satisfied upon all the evidence that the purported service upon Sapphire in England was invalid and must be set aside.

Defendant Sapphire's motion is granted in all respects. The action as against Sapphire is dismissed for lack of personal jurisdiction over it.

So ordered.