TARSTAR SHIPPING CO., Plaintiff,

v.

CENTURY SHIPLINE, LTD., Century Shipline & Agencies, Inc. and Koctug Line, Defendants.

No. 76 Civ. 1266 (RJW).

United States District Court,
S. D. New York.

May 23, 1978.

Freehill, Hogan & Mahar, New York City, for plaintiff; Philip V. Moyles, Robert J. Babiak, New York City, of counsel.

Hill, Betts & Nash, New York City, for defendant Koctug Line; Daniel K. Read, David I. Gilchrist, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiff, Tarstar Shipping Co. ("Tarstar"), owner of the vessel M/V "Aliki I.P." ("the Aliki"), sues defendant Koctug Line ("Koctug"), a Turkish shipping company, to recover $85,071.55 plus interest from March 8, 1976.[1] Tarstar claims that Koctug unjustifiably refused to honor Tarstar's notice of lien, served on Koctug on March 8, 1976, in which Tarstar asserted a superior interest in any freights or subfreights, up to the amount of $85,071.55, owing from Koctug to the charterer of the Aliki. Jurisdiction is based on diversity, 28 U.S.C. § 1332, and admiralty and maritime jurisdiction, 28 U.S.C. § 1333.

## FACTUAL BACKGROUND

Tarstar claims to have chartered the Aliki to Century Shipline, Ltd. ("Century, Ltd." or "Century"). Clause 5 of the charter party required Century, Ltd. to pay hire in cash, semi-monthly in advance. Clause 2 of the charter party required the charterer

---

1. Plaintiff originally sued "The subfreights of the M/V ALIKI I.P., in the hands of MARINE MIDLAND BANK, CENTURY SHIPLINE, LTD., CENTURY SHIPLINE & AGENCIES, INC. [and] KOCTUG LINE." On April 7, 1976, plaintiff filed a consent order of discontinuance against Marine Midland Bank. Apparently, a separate action in Bankruptcy Court is contemplated against the two Century defendants. Thus, the present action is against defendant Koctug only.

to provide and pay for all fuel (bunkers). The first hire payment, due on February 11, 1976 when the vessel was turned over to Century, was paid a couple of days later. However, the second hire payment of $65,812.50, due on or about February 26, 1976, and a bunker payment of $19,259.05, apparently due about the same time, were never paid. Clause 18 of the charter party provided "That the Owners shall have a lien upon all cargoes, and all subfreights for any amounts due under this Charter."

On January 9, 1976 Koctug had entered into a Liner Booking Note contract with Prodex International ("Prodex") whereby Koctug would carry a shipment of lentil beans from Baton Rouge, Louisiana, to Algiers, Algeria.[2] Koctug had "intended to carry this shipment on one of its vessels; but when the vessel could not meet the loading date, it substituted the M/V 'Aliki I.P.' by entering into a Freight Engagement" with Century Shipline & Agency, Inc., agent for Century, Ltd. (stipulated fact (e)). It accomplished this by contacting Mr. Charles Ries, a broker with International Chartering Services, Inc. ("International"), and asking him to locate a suitable vessel. Ries came up with the Aliki, which had been chartered to Century.

On February 25, 1976, in keeping with clause 23 of the Freight Engagement, which provided that the "[o]wners guarantee on board BS/L [Bills of Lading] latest Feb. 26, 1976," Prodex' cargo of lentil beans was loaded on board the Aliki in Baton Rouge and Century duly issued bills of lading.[3] Pursuant to the Freight Engagement, freight was to be paid to Century within six days after the issuance of the bills of lading, i. e., by March 2, 1976. Prodex was to pay freight or subfreight to Koctug and Koctug was to pay Century.

On March 1, 1976 ICD Export Corporation, one of the shippers of the lentil beans, delivered a check for $147,326.57 to Koctug. That same day Koctug endorsed the check over to its broker, International, and delivered it to International[4] for the latter to pay Century for the freight or subfreight due on or about March 2, 1976.

On March 8, 1976 Tarstar reacted to Century's default by having its attorney, Mr. Babiak, call Mr. Ustun of Koctug.[5] Later that day, Mr. Babiak had hand delivered to Mr. Ustun a notice of lien "on any freights or subfreights owed from you to Century Shiplines Agencies up to the [amount of

2. Although only one shipper—Prodex—was named in the liner booking note, a second shipper—ICD Export Corporation—was also involved.

3. There were two bills of lading, one listing Prodex as shipper and the other listing ICD Export Corporation as shipper. See note 2, *supra.*

4. "Q How did you send [the check] to ICS [International Chartering Services, Inc.]?
A That I don't remember. Either by messenger—we are in the same building but it went one way or the other to the attention of Mr. [Ries]."
(Ustun Tr 97)

5. Mr. Ustun's testimony regarding that phone call was as follows:
Q What did he say to you?
A He said that he understood that we have something to do with the lentil beans that's coming out from Baton Rouge, and that he wanted to collaborate on it or he wanted to talk on it.
Q How did he describe himself to you when he called you on March 8?

A He, I guess he introduce himself.
Q Do you recall now how he introduce himself?
A No, but he introduce himself.
Q Do you recall the substance of that conversation, what he said to you on March 8?
A I just told you that's all I recall.
Q What, if anything, did he say to you with respect to a lien upon the freight monies for the lentil cargo?
A Well, he said I guess something to the effect but on the same time I told him that we don't have any funds because he was looking for funds, some kinds of a funds, but I said that I don't have any funds.
Q Did he ask you why you did not have any funds?
A I don't know.
Q Did you tell him that you had taken and endorsed the check, Exhibit 3, over to somebody else already?
A No, I didn't.
(Ustun Tr 98–99)

$85,071.55].[6]  At trial, Mr. Ustun testified as to what ensued after receiving the notice of lien:

Q  After you received this letter on March 8, what did you do?

A  I haven't done anything.

Q  Did you call Mr. Babiak after you received the letter?

A  No.

Q  Why not?

A  It doesn't say on the letter that I should call him back.

Q  What was your interpretation as to that letter when you received it?

A  Nothing.  First time in my life I was given a letter like this.  It didn't mean anything to me.  Mr. Babiak's name didn't mean anything to me.  I never heard of it.  Freehill's name didn't mean anything to me.  I never heard of them.  Tarstar's name didn't mean anything to me.  I had never heard of them up to that moment.

. . . . .

Q  At any time after March 8, did you check with your brokers with respect to the freight payment on the Aliki, I.P. on the lentil beans?

A  No, sir.

Q  Is it your testimony after you received that letter you did nothing with respect to contacting your brokers who you endorsed the check, Exhibit 3, over to?

A  The letter was, the letter was clear to me.  It was saying to me, if I had any funds in my hand, that I should immediate return it to Freehill.

I did not have any funds in my hand.  I wasn't in any position to return any money to Freehill.  *If I had money in my hand, I wouldn't return it to Freehill, anyway.*

Q  Why didn't you call up your broker and ask him did he still have the check?

A  That wasn't necessary.

(Tr 100–03) (emphasis added).

As it turned out, Century had not yet been paid on March 8, 1976.  On March 3, 1976 International had deposited the check it had been given on March 1 in its special account at Marine Midland.  One week later, on March 10, 1976, International issued its own check to Century Shipline & Agency, Inc. in the amount of $127,519.38.  On March 11, 1976 Century Shipline returned the check to International and asked that it be certified.  On or about March 11, 1976 International got the check certified and returned it to Century Shipline.

Marine Midland paid the check to Century on March 12, 1976.  Later that day—late on Friday afternoon—Mr. Ustun told his attorney about the notice of lien.  Monday morning, March 15, 1976, the attorney, Koctug and International met to consider stopping payment on the certified check.  International in fact asked Marine Midland on March 15th if it could stop payment.  By that time, however, it was too late.  This suit was commenced on March 16, 1976.

**6.**  The Notice of Lien read in its entirety:

March 8, 1976

310-76/RJB

Koctug Line
17 Battery Place
New York, New York

Att: Mr. Uston [sic]
    Re:  ALIKI I. P.
         On Charter to Century Ship Lines Agencies, Inc. C/P dtd. New York February 6, 1976 Non-Payment Charter Hire

NOTICE OF LIEN

Dear Sirs:
    Please take notice that we represent Tarstar Shipping Co. Ltd., Owners of the M/V ALIKI I.P., under time Charter to Century Ship Lines Agencies, Inc.  The vessel picked up your cargo in Louisiana, sailing on February 25, 1976 for Algiers.  Charterers, Century Ship Lines Agencies, Inc., owe the Owners Charter hire in the amount of $65,812.50 and a bunker payment in the amount of $19,259.05.  Therefore this will notify you that Owners hereby exercise their lien granted under the terms of the Charter Party on any freights or subfreights owed from you to Century Ship Lines Agencies up to the above amounts and such freights can be paid only to us.

    You are cautioned that if you pay to Century Ship Lines Agencies, Inc. despite this Notice of Lien you will have to pay twice.

    Please turn over all freights and subfreights up to these amounts to "Freehill, Hogan & Mahar, as attorneys."

Yours very truly,
FREEHILL, HOGAN & MAHAR

Robert J. Babiak

RJB/mt

## PARTIES' CONTENTIONS

It is Tarstar's position that International was Koctug's agent for purposes of transmitting the payment to the charterer, that Koctug, therefore, had possession or control over the the funds until March 11, and, consequently, the March 8 notice of lien was timely. Accordingly, Koctug's failure to freeze the funds or otherwise notify its broker not to pay the charterer despite the timely notice of lien renders it liable for the amount requested in the notice of lien.

Koctug counters:

*First,* no lien could have arisen in favor of Tarstar inasmuch as the charter hire was payable to Tuna Shipping, which had originally been listed in the charter party as the owner. Koctug contends that the debt ran to Tuna and therefore so did the lien. Koctug also appears to the contend that Tarstar was not actually a party to the charter and that no charter party ever came into existence.

*Second,* Koctug maintains that when it entered a Freight Engagement with the charterer it did so as an agent of disclosed principals—the cargo owners; therefore, Koctug never owed any freight or subfreight to the charterer and cannot be liable for acting as an agent for a disclosed principal.

*Third,* Koctug contends that even though the charterer had not yet been paid on March 8, 1976, the notice of lien was not timely inasmuch as Koctug had already paid International. It maintains that it did not have possession or control over the funds while they were in International's possession because International was not its agent, but, rather, was the agent or bailee of the cargo owners. It maintains that it did not know that International had not yet paid Century on March 8, it was reasonable for it to assume that International had already done so, and because International was not its agent it had no obligation to check further.

*Fourth,* Tarstar is barred from recovery by its failure to exercise due diligence to protect itself against default. This defense is based on the premise that Tarstar knew or should have known of Century's impending financial difficulty and taken steps to secure itself against default.

*Fifth,* Koctug argues that Tarstar was guilty of laches in waiting until March 8 to assert its lien.

*Sixth,* the lien on freights or subfreights was extinguished when the cargo was released without assertion of a lien.

Koctug asks this Court to dismiss the complaint against it, vacate the warrant of attachment, vacate the summons to show cause and process of maritime attachment and garnishment, and award costs and attorneys fees against plaintiff.

This case was tried non-jury. The following constitute the Court's findings of fact and conclusions of law:

## FINDINGS AND CONCLUSIONS

1. *There Was a Charter Party Between Tarstar and Century and a Lien Arose in Tarstar's Favor.*

Tarstar's brokers in London, Independent Chartering, Ltd. ("Independent"), who had been appointed by Tarstar's London agent, P. Wigham-Richardson Co., Ltd., negotiated a fixture of the Aliki with Steen Christensen of N. J. Costalas, Inc. ("Christensen"), who represented Century Shipline & Agency Inc., agent of Century, Ltd. Andre Duma of Chester, Blackburn & Roder ("Duma") acted as cable broker, transmitting communications between Independent and Christensen.

An oral fixture was arranged on February 6, 1976 and was confirmed by telexes. Christensen thereafter prepared the charter party on a New York Produce Exchange Form. It was the custom for the owner to sign the charter party before the charterer. Accordingly, when the charter party was prepared Christensen delivered it to Duma and on February 11, 1976 Duma forwarded a copy to Independent and requested authority to sign the original on behalf of the owner.

On February 17, 1976 Independent responded:

"C/P NOW RECEIVED OWNER RELUCTANT DUE COMPANY POLICY TO ALLOW C/P TO BE SIGNED ON HIS BEHALF THEREFORE PLEASE POST ORIGINAL C/P TO US MEANTIME HAVE NOTED FOLLOWING MINOR ERRORS OWNERS STYLE SHOULD READ TARSTAR SHIPPING CO. OF LIBERIA (THIS OUR ERROR APOLOGIES SUBMITTED)"

Duma immediately telexed this information to Christensen.

Although Tarstar was listed in Lloyd's Register of Shipping as the owner of the Aliki, the owner's name apparently was not mentioned when the vessel was fixed and confirmed by telex. Both Duma and Christensen testified that they did not know who the owner was when they fixed the vessel, and confirming telexes do not mention the owner.

Christensen testified:

Tuna Shipping was given to us as the owner's style for insertion in the charter party.

Q  At what point in time was that given to you?

A  I don't know the exact date, but it must be, it is after the fixture. I guess a couple of days when we prepare the charter party and then we would ask for the name.

(Tr 66–67).

There is no documentary corroboration of Christensen's assertion that he was told that Tuna Shipping was the owner. It may be that he assumed Tuna was the owner when Independent (Tarstar's broker) requested on February 9 the insertion of a clause 5 to read:

Hire to be paid . . . to First National City Bank, 399 Park Av., NY 10011 for credit to the A/C of First National City Bank = London (Strand Branch) A/C Tuna Shipping

In any event, it is clear that although for some reason the original charter party prepared by Christensen showed Tuna Shipping to be the owner, Independent requested that the owner be changed to Tarstar, Christensen got approval of the change from Century, and the change was made without altering clauses 5 (hire to be paid to Tuna Shipping) and 18 (owner's lien on subfreight). Thus, Christensen testified that plaintiff's exhibit 1 is "the charter party which represents the agreement." There is no evidence that either the original or the corrected charter party was signed by any party.

Koctug contends that if any lien arose it was in favor of Tuna Shipping, not Tarstar, either because it is not clear that Tarstar was the owner or because it is not clear that Tarstar was a party to the charter or because no charter party came into existence inasmuch as:

1. the original charter party listed Tuna Shipping as the owner;

2. the corrected charter party is internally inconsistent in naming Tarstar as the owner while providing for hire to be paid to the account of Tuna Shipping and in the absence of clear evidence that such an inconsistency was intended a lien should not arise in Tarstar's favor;

3. the so-called corrected charter party was not signed by either party.

■ The Court finds no merit in this line of argument. The unrebutted proof indicates that the insertion of Tuna as the owner's style in the original charter party was erroneous and that Century did not object to making the correction and the correction was in fact made. Nor is this correction of the name of the vessel owner inconsistent with the clause requiring hire payment to be made to First National City Bank for credit to the account of Tuna Shipping, inasmuch as the owner is free to designate to whom hire should be paid, and such a designation is not inconsistent with a claim of ownership.

■ Koctug's real argument, implicit in the first two arguments and explicit in the third, is that Tarstar never signed either the original or the corrected charter party. However, maritime contracts are valid and enforceable even if not in writing. *Texaco Export, Inc. v. Overseas Tankship Corp.*, Nos. 77–7358, –7382, 573 F.2d 717 (2d Cir. Mar. 2, 1978), at 720 n. 8, *citing Kossick v. United Fruit Co.*, 365 U.S. 731, 734 & n. 4,

81 S.Ct. 886, 6 L.Ed.2d 56 (1961). "The critical issue is not whether the charter party was signed by the party sought to be charged . . . , but whether there was a meeting of the minds as to the essential terms of the agreement, even though unsigned by one party." *A/S Custodia v. Lessin International, Inc.*, 503 F.2d 318, 320 (2d Cir. 1974). The proof in this case clearly establishes that there was a meeting of the minds and therefore the corrected charter party was a binding contract between Tarstar and Century despite the absence of signatures. *See Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 534–35 (2d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). Accordingly, the lien arose in Tarstar's, not Tuna's, favor.

2. *Koctug Acted on its Own Behalf, Not on Behalf of Disclosed Principals, In Engaging Century.*

The liner booking note between Koctug and Prodex obligated Koctug to have a ship available between February 20 and 28th for carriage of Prodex' cargo. Mr. Ustun of Koctug testified that because "the vessel that we intended to list this particular tonnage . . . was delayed very much . . . *we* had to find a substitute vessel." (emphasis added). He further testified: "When I found out that our vessel wasn't going to be able to make the dates stipulated in the booking note that I had with Prodex, *I* started looking for a ship." (emphasis added). Furthermore, it is stipulated that Koctug substituted the Aliki for its own vessel by entering a freight engagement with Century. (See stipulated fact

(e), quoted *supra*). Thus, although the freight engagement is not signed by Koctug—or by any party to it—it can be inferred that it was entered by Koctug in fulfillment of its obligation under the liner booking note to deliver a ship.

██ Koctug maintains, however, that when it entered the freight engagement it did so only as agent for the cargo owners who were purportedly disclosed principals. Of course, the burden is on Koctug to prove this assertion, *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 173 (5th Cir. 1975), and that burden apparently cannot be met by offering only the self-serving statements of the purported agent. *Eitel v. Schmidlapp*, 459 F.2d 609, 614 (4th Cir. 1972); *United States v. Consolidated Laundries, Corp.*, 291 F.2d 563, 579 (2d Cir. 1961); *Kirkland v. Sapphire International Touring, Ltd.*, 262 F.Supp. 309, 314 (S.D.N.Y.1966); *see Julien J. Studley, Inc. v. Gulf Oil Corp.*, 386 F.2d 161, 165 (2d Cir. 1967). Inasmuch as there is insufficient evidence in the record to support Koctug's assertion that it was Prodex' agent,[7] it has not met its burden. Therefore, the Court finds that Koctug acted in its own behalf, rather than on behalf of Prodex, in engaging the Aliki through the charterer, Century.

3. *International was Koctug's Agent for Payment, Rather than Cargo Owners' Agent or Bailee. Therefore the Notice of Lien was Timely and Affirmative Conduct was Required: Koctug was not Entitled to Merely Assume that Century had Already Been Paid*

Just as there was insufficient evidence that Koctug acted as agent of the cargo

---

**7.** The only support for the proposition that Koctug acted as an agent for the shippers comes from Koctug's own mouth:

Q Who shipped it on the Aliki, I.P.?
A Prodex shipped it on the Aliki, I.P.
Q Did Prodex enter into any contract with the owners of the Aliki, I.P.?
A No, not that I'm aware of, *not directly*.
Q Who arranged for the Prodex cargo to go on the Aliki, I.P.?
A We did.

(Ustun Tr 95) (emphasis added).
The implication of this testimony is that Prodex contracted with Tarstar *indirectly* through Koctug as agent.

The freight engagement was not signed by and does not mention the cargo owners. The mere fact that the bills of lading were issued to the cargo owners does not compel the inference that the cargo owners entered the freight engagement with Century—especially since the cargo owners already had a contract of carriage with Koctug. In the absence of such independent proof that the cargo owners manifested an intention to be bound by actions taken by Koctug in fulfillment of Koctug's obligation to provide a carrier, the Court attaches little or no weight to Mr. Ustun's self-serving statements.

owners, so too Koctug failed to sustain its burden of proving that it and, in turn, International acted as bailees for the cargo owners in transmitting the freights or sub-freights to the charterer. On the contrary, the proof that supports the inference that Koctug engaged Century on its own behalf leads to the conclusion that Koctug was obligated in its own right to pay freight to Century.[8] The fact that that obligation could or would be satisfied by money owing from Prodex to Koctug does not compel a different result. The Court finds that when Koctug transmitted to International funds generated by a debt from Prodex to Koctug it did so to extinguish its own debt to Century. Therefore, the Court finds that neither Koctug nor International was a bailee of the cargo owners.[9]

■ That leaves the question of whether International was Koctug's agent for payment. The Court starts from the proposition that International was clearly Koctug's broker and that whether or not it was also Koctug's agent is a question of agency law, see *A/S Custodia v. Lessin International, Inc.*, 503 F.2d 318, 330 (2d Cir. 1974), and must turn on the objective facts, *Interocean Shipping Co. v. National Shipping & Trading Corp., supra*, 523 F.2d at 537.

> It is immaterial that [International may have] thought of [itself] as a "broker" and not an "agent" of [Koctug], or that [Koctug] did not intend to make [International] an agent. Agency is a legal concept which depends on the manifest conduct of the parties, not on their intentions or beliefs as to what they have done.

*Id.*

The objective facts are that the funds from Prodex were to be given to Century, but they were first given to International by way of endorsement over to International for the purpose of transmission to Centu-

ry, and International in fact paid Century. Inasmuch as International did not owe a debt to Century and therefore was not acting on its own behalf, and International was not acting on behalf of Century or the cargo owners, the conclusion is inescapable that it was acting on behalf of Koctug. Mr. Ustun said as much, though not in so many words:

> Q Did there come a time when, in fact, *you* paid Century?
> A My broker paid them, *yes.*
> Q How did your broker come into funds to pay Century?
> A I passed the funds to him.

(Tr 95) (emphasis added).

Accordingly, the Court finds that International was Koctug's agent for purposes of paying Century. Furthermore, because International was Koctug's agent for payment, the Court finds that Koctug at least had control over the funds, if not actual or constructive possession, when they were in International's hands on March 8–11, 1976.

■ Koctug's possession or control over the funds during March 8–11 is critical because "[a] shipowner's lien on subfreights is discharged by good faith payments by the shipper to the charterer without notice of the shipowner's rights. *Marine Traders, Inc. v. Seasons Navigation Corp.*, 422 F.2d 804, 806 (2d Cir. 1970). *In re North Atlantic & Gulf Steamship Co.*, 204 F.Supp. 899, 904 (S.D.N.Y.1962), *aff'd sub nom. on other grounds, Schilling v. A/S Dannebrog*, 320 F.2d 628 (2d Cir. 1963). The question is whether the payment to Century was without notice and in good faith when in fact Koctug had received notice of the lien three or four days prior to its agent's paying Century. The Court holds that it was not.

■ Because International was Koctug's paying agent, and because Koctug did not know for a fact whether or not Century had already been paid, once Koctug was notified

---

8. Q Freight was to be paid, then, for the cargo to move aboard the Aliki, I.P., correct?
   A Definitely.
   Q Who would have to pay that freight?
   A Well, we were going to collect from Prodex and then turn it to Century.

(Ustun Tr 94)

9. In finding that Koctug did not prove a bailment, the Court need not reach plaintiff's argument that the law of bailments does not apply to money.

of the lien it had an obligation to find out whether the funds were still in its agent's possession, and if so, to inform its agent not to release the funds to Century. W. Seavey, *Studies in Agency* 62–64 (1949); *see* Restatement [Second] of Agency §§ 212, 213, 256 and *comment b* to § 256 (1958). The agency relationship imposed a duty to act and precluded Koctug from simply assuming that Century had already been paid. To blind itself to its agent's knowledge as to whether or not Century had been paid, and to keep its agent in the dark as to the lien can hardly be considered good faith.

Moreover, even if there were not an absolute duty to act arising out of the agency relationship, the Court finds on the following facts that it was not reasonable for Koctug to have simply assumed that Century had already been paid. It is reasonable to infer that the difference between the $147,326.57 check drawn by ICD Export Corporation and the $127,519.38 check from International to Century represented commissions owing to Koctug [10] and International.[11] It is also reasonable to infer that to insure that it got its commissions, International followed a custom and practice of depositing in its own account a shipper's check for freight plus commissions and then waiting until the check cleared before writing its own check to the charterer for the net amount of freight less commission.[12] The Court further finds that Koctug was aware of this custom and practice.[13] Thus, it is reasonable to infer that when Koctug indorsed the check from ICD Export over to International it knew or should have known that International would not pay Century immediately, but rather, would deposit the check, wait for it to clear, and thereafter send Century its own check for the net amount owing. For this reason it was not reasonable for Koctug to merely assume on March 8, 1976 that International had already turned the proceeds over to Century.

4. *Tarstar is not Chargeable with Knowledge of Century's Financial Condition and Impending Default. Even if it Were, it did All that it Could to Protect Itself Inasmuch as it was Powerless to Stop the Issuance of Prepaid Bills of Lading and Could not Lien the Cargo. Therefore, it Exercised Due Diligence.*

■ It is Koctug's contention that because Century was a couple of days late in making the first charter hire payment, and purportedly delayed bunkering the vessel in order to postpone paying for bunkers, Tarstar knew or should have known of Century's precarious financial condition and taken steps to secure itself against default. Specifically, Koctug argues that Tarstar should not have allowed the issuance of prepaid bills of lading and should not have permitted the cargo to be released.

It is true that the first hire payment, due on February 11, 1976 when the vessel was turned over to Century, was not paid until one or two days later.[14] However, that delay did not arouse Tarstar, perhaps in view of clause 47B of the charter party which provided:

[W]here there is any failure to make "punctual and regular payment" due to oversight or negligence or error or omis-

---

10. Q Who arranged for the Prodex cargo to go on the Aliki, I.P.?

A We did.

Q You were going to get paid for that, were you not?

A Yes.

Q Who was going to pay you?

A Prodex, the shipper.

(Ustun Tr 95)

11. Mr. Ustun testified that he thought Century, rather than Koctug, was paying International its commission, but he was not sure. (Tr 104–05).

12. Mr. Ustun testified that Koctug had had dealings with International in which Koctug was the carrier and International was the shipper's broker, and in those cases International transmitted the freight from the shipper by giving Koctug a check which was smaller than the check International had gotten from the shipper. In other words, International deducted its commissions and sent Koctug a check for the net balance. (Tr 105–06).

13. See note 12, *supra.*

14. February 12, 1976 may have been a bank holiday.

sion of Charterers' employees, bankers or Agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners two (2) banking working days notice to rectify the failure, [sic] *where so rectified the payment shall stand as punctual and regular payment.* (emphasis added).

The Court is not prepared to find that this slight delay in making the first installment should have aroused Tarstar's suspicions as to Century's financial stability.

Whether or not the failure to pay for bunkers should have made Tarstar suspicious depends on when the bunker payment became due. Mr. Duma, the cable broker, testified that bunkers were payable "[u]pon completion of bunker survey." Presumably, that would have made it payable when the vessel was bunkered. On February 17, 1976, Mr. Duma relayed to Christensen (Century's broker) Tarstar's request for remission of "value of bunkers on delivery". Since this telex was sent six days after delivery of the vessel to Century, presumably the words "on delivery" refer to delivery of the bunkers on board ship. Koctug apparently agrees that the payment was due when the bunkers were delivered inasmuch as its argument that Century refused to bunker in New York, waiting instead to bunker in Baton Rouge in order to postpone paying for bunkers, rests on the unstated assumption that the bunker payment would be due when the vessel was actually bunkered. The bunkering apparently occurred on or about February 25 when the lentil beans were loaded on board at Baton Rouge. Therefore, the bunker payment was not due until on or about February 25, about the same time that the second charter hire payment became due. Accordingly, the non-payment for bunkers prior to February 25 or 26 would not have been a cause for suspicion.

Thus, until on or about February 26th, Century had not actually defaulted on any

of its obligations to Tarstar. That leaves Koctug's argument that Tarstar should have been suspicious of Century's purported refusal to lift bunkers in New York when the vessel was first turned over to it.[15] However, on the issue of the purported refusal to bunker the proof is in balance. A February 18th telex from Christensen to Century quotes a telex from the owner to its London brokers in which the owner stated that it had learned that the vessel sailed from New York with an inadequate supply of bunkers and, the master had informed it, this occurred because the charterer refused to lift bunkers in New York. This telex is rebutted, however, by the charterer's response, contained in a February 18th telex from Christensen to Duma. Thus, the Court cannot find that Century in fact "refused" to lift bunkers in New York. For this reason, the Court cannot find that the delay in lifting bunkers should have caused Tarstar to suspect Century's financial condition.

In view of these findings, the Court cannot find that Tarstar knew or should have known of Century's financial condition and impending default. However, even if it had or should have known, there was nothing else Tarstar could have done to protect its position.

### a. *Tarstar Could Not Stop Issuance of Prepaid Bills of Lading*

The liner booking note between Koctug and Prodex had provided that freight from Prodex to Koctug was to be prepayable. Likewise, clause 24 of the freight engagement entered into between Koctug and Century provided for "[f]reight fully prepaid in New York 6 days after release of Bills of Lading less commission." The charter party provided that the "Captain . . is to sign Bills of Lading for cargo *as presented.*" (clause 8) (emphasis added). Thus, Tarstar had no choice but to approve the prepaid bills of lading. *See* Allen, Liens: Liabilities Arising From Delay or

---

**15.** The Court notes that Koctug withdrew its offer of proof with respect to whether Tarstar was chargeable with knowledge of Century's

lateness in making hire payments to the "Montreal Star," another vessel fixed by Duma. (Tr 51–57).

Failure in Performance, 49 *Tul.L.Rev.* 970, 972 (1975) (hereinafter cited as "Allen, *Liens*"). Accordingly, the bills of lading issued by Century, Ltd. provided for "Freight Prepaid As Per Booking Note."

### b. Tarstar Could Not Lien the Cargo

Once the freight was paid by the cargo owners and prepaid bills of lading were issued to them a lien could not arise against the goods. 2A *Benedict On Admiralty* § 35 (7th ed. 1977); *see* Allen, *Liens* at 972; *cf.* G. Robinson, *Handbook of Admiralty Law,* § 56, at 402 (1939). Even apart from this, a cargo lien could not have arisen in Tarstar's favor inasmuch as the charter party and the cargo lien reserved to Tarstar therein were not incorporated in the bills of lading. *See N. H. Shipping Corp. v. Freights of the S/S Jackie Hause,* 181 F.Supp. 165, 169 (S.D.N.Y.1960). Thus "the provisions of the charter party are not binding on the cargo owner[s] [and] the bills of lading alone are the contracts of carriage." 2A *Benedict On Admiralty, supra,* § 34. The bills of lading reserved a cargo lien only in favor of the carrier (Century), not the owner.

In sum, in view of the unavailability of alternatives,[16] Tarstar had no choice but to assert its lien against freights or subfreights and cannot be found to have lacked due diligence.

### 5. Although Tarstar Delayed in Serving its Notice of Lien, the Delay did not Prejudice Koctug, and so There was no Laches.

Century was in default on February 26, 1976 with respect to charter hire and bunker payments. In accordance with clause 47B of the charter party, quoted *supra,* Tarstar notified the charterer of its default by a March 1, 1976 telex from Duma to Century stating that Tarstar protested the non-payment of hire and bunkers, but it did not serve Koctug with the notice of lien until March 8, 1976. Thus, Tarstar waited four days before contacting Century about the default and, then waited a week longer before deciding to assert a lien against the freights or subfreights owing from Koctug. However, in the final analysis International's paying Century was caused not by Tarstar's delay in serving the notice of lien, but by Koctug's own failure to act reasonably and in good faith once it had the notice. Therefore, Koctug's having to pay the freights twice cannot be said to have been caused by Tarstar's delay. For this reason, the Court finds that Koctug was not prejudiced by Tarstar's delay, and because there was no prejudice the Court cannot find laches. *See Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 574 (2d Cir. 1973).

### 6. A Lien on Freights is Non-Possessory and is not Extinguished by Releasing the Cargo Without Assertion of a Lien.

Koctug argues that Tarstar's lien on freights was lost when the cargo was released without assertion of a lien. As the Court held earlier, however, Tarstar was not entitled to assert a cargo lien against third parties who had no notice of such a lien and who had a paramount interest in the goods by virtue of their possession of prepaid bills of lading. Obviously, if a shipowner is not entitled to lien the cargo it would be unfair to preclude it from liening the freights on the ground that it failed to lien the cargo. Perhaps for that reason the rule is that a lien on freights or subfreights is non-possessory, *cf. Beverly Hills National Bank & Trust Co. v. Compania de Navega-*

---

16. Although Koctug didn't mention it, clause 5 of the charter party provided that failing punctual and regular payment of hire or other breach "the Owners shall be at liberty to withdraw the vessel from the service of the charterers . . . ."

However, Tarstar was not at liberty to withdraw the vessel until the cargo was discharged. *Luckenbach v. Pierson,* 229 F. 130, 132 (2d Cir.

1915); *accord, Diana Compania Maritima, S. A. of Panama v. The Subfreights of the S. S. Admiralty Flyer,* 280 F.Supp. 607, 612–13 (S.D. N.Y.1968); *Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co.,* 227 F.Supp. 872, 881 (S.D. N.Y.1964). Thus, withdrawal of the vessel was not an available alternative to liening the freights.

*cione Almirante, S. A.,* 437 F.2d 301, 304 (9th Cir.), *cert. denied,* 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971), and "does not depend upon any right which the owner may have to proceed against the cargo or upon the possession thereof, but upon the agreement of the parties creating it." *The Solhaug,* 2 F.Supp. 294, 299 (S.D.N.Y.1931). "[T]he shipowner need not detain or proceed against the cargo at all in order to enforce his lien [on freight or subfreight]." Allen, *Liens* at 973. *See also N. H. Shipping Corp. v. Freights of the S/S Jackie Hause, supra,* 181 F.Supp. at 171. Thus, this argument, too, must be rejected.

Based on the foregoing findings and conclusions, the Court awards judgment to plaintiff.

Settle judgment on notice.